JOHNSTOWNE CENTRE PARTNERSHIP, Plaintiff and Counterdefendant-Appellant and Cross-Appellee, *v.* GEORGE CHIN, JR. *et al.*, Defendants and Counterplaintiffs-Appellees and Cross-Appellants.

Fourth District  No. 17693

Opinion filed November 30, 1982.—Rehearing denied December 28, 1982.

WEBBER, J., concurring in part and dissenting in part.

Pelini, Crewell & Sheffler, of Urbana, for appellant.

Meyer, Capel, Hirschfeld, Muncy, Jahn & Aldeen, of Champaign, for appellees.

JUSTICE LONDRIGAN delivered the opinion of the court:

The plaintiff, Johnstowne Centre Partnership, developed a shopping block in Champaign and leased a site there to the defendants, George Chin, Jr. and Eddie Moy Chin, for operation of a restaurant. The Chins later repudiated their lease, and the Partnership sued: the trial court found the repudiation unjustified and awarded damages. On appeal the Partnership seeks additional damages; on cross-appeal the Chins argue that their own performance was excused by the Partnership's two breaches of the lease and that the trial should have been reopened for the testimony of another witness. We conclude that the Partnership is entitled to additional damages but affirm the trial court's decision in all other respects.

On February 25, 1976, the parties executed a 10-year lease beginning November 15, 1977, for a site in Johnstowne Centre, the new shopping area. The defendants formally repudiated the lease June 10,

1977. To mitigate damages the Partnership obtained a substitute tenant, the Parthenon Restaurant, who left about 20 months later; after an 8-month period of vacancy, the premises were rented to Giordano's Restaurant. The Partnership appeals the trial court's decision denying damages for the period between substitute tenants.

At trial the Chins asserted as counterclaims and affirmative defenses the Partnership's failure to provide a promised cathedral or extra-high ceiling in their site and the Partnership's decision to rent space elsewhere in the Centre to another restaurant, in violation of a restrictive covenant in their lease. To support the first counterclaim and affirmative defense, about the ceiling, the Chins moved to have the trial reopened to present the testimony of an architect who had helped design the premises; this witness was not located until after the end of the trial. The court found against the Chins on the counterclaims and affirmative defenses and denied their motion to reopen. The Chins raise these issues in their cross-appeal.

I

The Chins' obligations under the lease began November 15, 1977. The lease requires monthly payments of rent and of fees; the fees are for maintenance of the Centre's common areas and for membership in an association of the Centre's merchants. The 10-year lease of the first substitute tenant, the Parthenon, began March 15, 1978, and the Parthenon made payments through November 30, 1979; effective July 1, 1979, the Centre's merchants decided to increase the monthly fees for dues for membership in their association. The second substitute tenant, Giordano's, began payments under a 10-year lease August 1, 1980, and was still a tenant at the time of the trial a year later. The trial court awarded damages—rents, fees, and interest—for the four months preceding the start of the Parthenon's lease but denied recovery of rents and fees lost during the eight-month gap between the substitute tenants. The trial court gave two reasons for denying these damages. In an oral decision, the judge said that the Parthenon's failure should not be assessable to the Chins; in a later written order he relied on an agreement between the Partnership and the Parthenon settling or terminating the Parthenon's liability under its 10-year lease. The court awarded the Partnership other damages too and credited the Chins with their downpayment and deposit and interest on those amounts; these calculations produced a net award of $16,252.07 to the Partnership.

■ As support for the claim to damages for the eight-month period between substitute tenants, the Partnership relies on paragraph

14 of the Chins' lease, which says:

> "If Lessee's right to the possession of the Premises shall be terminated in any way, the Premises, or any part thereof, may, but need not, be relet by Lessor *** but Lessor shall not be required to accept or receive any tenant offered by Lessee, nor to do any act whatsoever or exercise any diligence whatsoever, in or about the procuring of another occupant or tenant to mitigate the damages of Lessee or otherwise, Lessee hereby waiving the use of any care or diligence by Lessor in the reletting thereof; and if a sufficient sum shall not be received from such reletting to satisfy the rent hereby reserved, after paying the expenses of reletting and collection, *** Lessee agrees to pay and satisfy all deficiency; but the acceptance of a tenant by Lessor, in place of Lessee, shall not operate as a cancellation hereof, nor to release Lessee from the performance of any covenant, promise or agreement herein contained, and performance by any substituted tenant by the payment of rent, or otherwise, shall constitute only satisfaction pro tanto of the obligations of Lessee arising hereunder."

The Partnership argues that it has done nothing that could be construed as releasing the Chins from their obligations.

We conclude that paragraph 14 of the lease entitled the Partnership to damages accruing in the period between substitute tenants: it expressly provides that reletting the premises does not cancel the Chins' lease and that their obligations under it will be satisfied only to the extent of a substitute tenant's payments. Paragraph 14 applies throughout the life of the Chins' lease, 10 years.

*Spear v. Haggarty* (1912), 168 Ill. App. 559, reached the same result under similar circumstances. In that case Spear rented to Haggarty a residence for one year, from May 1, 1908, to April 30, 1909; the lease provided that if the lessee abandoned, deserted, or vacated the premises and the premises were vacant for five consecutive days, the lessor could re-enter and relet, and apply all the proceeds toward the rent accruing under the indenture. Haggarty moved out in August 1908, surrendering the keys, but did not try to find a substitute tenant. Later that year Spear found one, who paid some rent and who left in February 1909. The premises were then vacant until the expiration of Haggarty's term. Spear sued for $145 in rent due under the lease, and the court affirmed a judgment in that amount in Spear's favor:

> "The sum of $145 is the balance due for rent from Haggarty for the entire term, less the sums received by Spear from said

third party." (168 Ill. App. 559, 560.)

Haggarty, the original tenant, therefore was liable for lost rents accruing after the departure as well as before the arrival of the substitute tenant.

The termination agreement between the Partnership and the Parthenon does not prevent recovery, for it concerned only the Parthenon's past and not future obligations. The agreement was not introduced into evidence; Harold Halpern, one of the partners, testified that the agreement essentially provided that the Parthenon would repay in part its notes that the Partnership held. Halpern explained that at some point during the tenancy the Parthenon ran short of money and gave the Partnership notes to offset reductions in its rent; the Parthenon was in or near bankruptcy at the end of its tenancy.

No evidence supports the Chins' argument that the settlement agreement pertained to rents and fees accruing after the Parthenon vacated the premises. Even if the agreement did include such payments, they would be credited against the Chins' liability and would not release them from their obligations under the lease.

■ The Chins argue that if the Partnership recovers for the eight-month period between substitute tenants, they should be credited with the difference between what Giordano's will pay in rent and what their own lease requires.

Recovery for breach of a lease is limited, however, to amounts due at the time of trial. (*People ex rel. Nelson v. West Town State Bank* (1940), 373 Ill. 106, 25 N.E.2d 509 (bank receiver disaffirms lease; unless lease provides otherwise, the bank's lessor may not recover rents accruing after the disaffirmance, for the receiver is liable only for claims on which a right of action exists at the time of his appointment, and the payment of future rents is not a current obligation); *Dorris v. Center* (1936), 284 Ill. App. 344, 1 N.E.2d 794 (lessor may sue for installments of rent as they come due, for several accrued installments, or for the entire amount at the end of the term).) In support of their argument the Chins cite *Wanderer v. Plainfield Carton Corp.* (1976), 40 Ill. App. 3d 552, 351 N.E.2d 630. In that case Plainfield Carton signed a five-year lease for a building but moved out before the end of its term; a substitute tenant was finally obtained, and that tenant paid more rent than Plainfield Carton's lease required. In the lessor's suit for damages accrued before the arrival of the substitute tenant, the court held that Plainfield Carton was entitled to credit for the excess amount of rent received by the lessor. The Chins correctly point out that Plainfield Carton was seeking credit for excess amounts that the lessor stood to receive under the substitute ten-

ant's lease.

"On appeal in this court, defendant Plainfield contends that the trial court should have credited defendant (as an offset to its liability for delinquent rent) with rental received *and to be received* by the landlord, Wanderer, from a new tenant during the balance of the original lease term, to the extent that those rentals exceeded the rent called for in the original lease." (Emphasis added.) (40 Ill. App. 3d 552, 553-54, 351 N.E.2d 630, 632.)

The court allowed credits through the end of Plainfield Carton's term.

We decline to follow *Wanderer* on this question. We note that the original or underlying lease was for only five years and that it expired some six weeks before the appellate court filed its opinion. Also, the court did not discuss the timeliness of the claim for credits; apparently the lessor did not raise this issue.

Crediting the Chins with the greater rent that Giordano's is obligated to pay would be speculative, given the length of time remaining on the Chins' lease. We therefore see no reason in this case to depart from the rule of *West Town State Bank* and *Dorris* that actions for rent—and lessees' credits—should be based on accrued rather than future payments and obligations.

## II

■ The Chins argue that the Partnership violated a restrictive covenant in their lease by renting space elsewhere in the Centre to another restaurant, Lox, Stock, and Bagel (LS&B). LS&B signed its lease a month after the Chins signed theirs. Paragraph 32 of the Chins' lease says:

"*RESTRICTIVE COVENANT.* Lessor agrees that it will not permit any other tenant within JOHNSTOWNE CENTRE to operate restaurant facilities, except that Lessor may rent for purposes of a coffee shop or other snack shop operation premises not to exceed 1,500 square feet of interior space, plus outside seating area immediately adjacent to such premises. Said coffee shop or snack shop will have a limited menu and will not sell complete meals. Lessor will not permit any other tenant of JOHNSTOWNE CENTRE to obtain a liquor license for consumption of beverages on the premises within JOHNSTOWNE CENTRE. Notwithstanding the foregoing, any tenant within JOHNSTOWNE CENTRE shall be permitted to sell, as incidental to its operation, ice cream, candy, soft drinks, milk, packaged liquors, cheeses, grocery items and 'carry-out' snacks.

This restriction also applies to the sixty-four front feet of property immediately East of Johnstowne Centre."

The Chins argue that LS&B is a restaurant, not a coffee or snack shop, and that its menu is a complete one.

Three witnesses testified about this issue: John Kiser, part owner and manager of LS&B, who described LS&B's menu and operations, and defendant George Chin, Jr. and Harold Halpern, one of the partners, who explained what their expectations were when they negotiated the covenant. The trial judge called LS&B "a restaurant with a limited menu" and held that it conformed to the covenant.

A lessor's violation of a restrictive covenant like the one here is a breach of the lease. (*University Club v. Deakin* (1914), 265 Ill. 257, 106 N.E. 790.) We conclude, however, that the Partnership has complied with the covenant.

Kiser testified that LS&B's menu remains the same throughout the business day, 11 a.m. to 9 p.m., and consists of sandwiches, soups, a salad bar, beverages, and desserts. Service is informal: customers line up at a counter, place their orders, wait as the food is prepared, and then slide trays on a cafeteria rail to a cashier. Customers also clear their tables when they are done eating; the baskets in which the food is served and the trays are the only items that LS&B reuses. Almost all the kitchen equipment is machinery for making bagels.

Each party presented, without objection from the other, parol evidence on the meaning of the covenant. Defendant George Chin, Jr., testified that during negotiation of the lease in autumn 1975, Harold Halpern referred to a similar project in Bloomington, Indiana, containing a store called the Nutcracker Sweet that sold yogurt and cookies and other desserts. Halpern showed Chin a photograph of the store and told him that a similar one was planned for the site that LS&B occupies.

In rebuttal, Halpern contradicted Chin's recollection. Halpern confirmed showing Chin a photograph of the Nutcracker Sweet but testified that it served sandwiches, soup, salad, and egg dishes in addition to yogurt and desserts; Halpern testified that he "described the operation quite fully" to Chin.

The trial court's decision on this question is not against the manifest weight of the evidence. LS&B serves a limited variety of food in an informal manner. Although the covenant does not define what it prohibits—restaurants and complete meals—and what it permits—limited menus and snack and coffee shops—its tenor is broad enough to include LS&B. This finds support in Halpern's testimony. The Nutcracker Sweet's menu, as he described it, is no more limited than

LS&B's, and the parties used the Nutcracker Sweet as an example of what the covenant would permit.

## III

■ The Chins argue that the initial plans and specifications that were attached to and made a part of their lease showed a cathedral or extra-high ceiling for their site, that the.final plans did not provide the type of ceiling, and that clause (b) of rider·B of the lease required that all changes in plans be approved by both lessor and lessee. That clause says in part:

> "All items to be provided by lessor as set forth above will be installed in accordance with plans mutually approved."

The items that the lessor promised to provide included "[e]nclosed area for Lessee's occupancy" and "[e]xterior design of Premises in accordance with preliminary plans submitted by Lessee."

George Chin, Jr. testified that in negotiating the lease he asked for a cathedral ceiling, 25 to 40 feet high, with skylights and room for a balcony and trees; Chin wanted the restaurant to be roomy and dramatic. The initial plans provided the desired ceiling, according to Chin, as did some drawn in August 1976, but the final plans, which he saw late in 1976—construction started in March 1977—gave much less interior space.

Neil Strack, an architect, testified for the Chins; he was not involved in designing or constructing the Centre. Examining at trial the initial plans that were attached to the lease, Strack said that they show an extra-high ceiling over more than half the Chins' floor area but do not specify the height of the ceiling. The final plans provide a high ceiling over a smaller part of the floor area, and the ceiling varies in height from 28 to 14 to 10 feet. The initial plans are not detailed and do not show what type of roof—cathedral or shed—was intended.

Delbert Smith, the Chins' architect in 1976, also said that the initial plans do not show which type of roof was intended; drawings that were circulated among the parties in late spring or early summer 1976 showed a cathedral roof. Later that summer Smith saw drawings with a shed roof and told George Chin, Jr., of the change.

Three letters from Halpern to the Chins were introduced into evidence. The first, dated September 17, 1976, instructed the Chins and their architect to work with the Partnership's architect. The second letter, dated October 21, 1976, said that the Centre's plans were complete, that the Chins' plans for the interior of their site had not been received, and that the Centre was assuming that the kitchen would be

a certain size. The third letter, dated November 2, 1976, said that construction was about to start, that assumptions had been made in the absence of the Chins' plans, and that any changes would be made at their expense.

Halpern testified that before the lease was signed he and the Chins talked about ceiling heights—the ceilings in all the other first-floor sites of the Centre are 10 feet. The Chins did not specify a desired height but did say that they wanted a high ceiling with room for plants. Halpern also testified that the Chins did not respond to his first two letters; he sent the third by certified mail. Halpern telephoned them several times in September and October 1976 to talk about the plans, but the Chins were never in and did not return the calls. During that period Halpern spoke to George Chin, Jr., four or five times in person, telling him to review the plans. By the end of November 1976, however, the Chins said that they were unhappy with the final plans.

Halpern testified that the only difference between the initial and final plans was the substitution of beams for trusses to support the roof, which made a balcony possible. Copies of the final plans were sent to Smith.

The trial judge, in his oral decision, said that the Chins waived any right under clause (b) of rider B to disapprove plans; he emphasized the Chins' failure to act after receiving Halpern's letters. This decision is not against the manifest weight of the evidence. Even if the Partnership materially altered the plans, it did not attempt to make a secret of that. The record shows that plans were sent regularly to the Chins or their architect; Halpern's letters warned them that construction would proceed without their plans. Alternatively, the extent of the change in plans is in dispute. According to Halpern, the only change was a minor one. The witnesses also disagreed on exactly what the initial plans provided in the way of a ceiling and roof, though all thought that they were somewhat ambiguous.

## IV

The Chins also argue that the trial court should have granted their motion to reopen the case to hear the testimony of Daniel Czekanski, the Partnership's architect. In the motion the Chins asserted that Czekanski was a material witness and was not found until July 30, 1981, which was a month after the end of the trial, practicing architecture in Danville. In an affidavit accompanying the motion Czekanski said, in substance, that Halpern instructed him to save money by lowering much of the ceiling provided in the initial plans and

hoped that the Chins and their architect, Smith, would not notice the change. Czekanski also said that he could easily have told Smith of the change but did not.

■ The parties have correctly construed the motion as one for a new trial to hear newly discovered evidence. (See *Stocker v. Scherer* (1953), 1 Ill. 2d 405, 115 N.E.2d 614.) A party requesting such relief must show that the evidence is likely to cause a different result and could not, with diligence, have been produced during trial. (*People ex rel. Cizek v. Azzarello* (1980), 81 Ill. App. 3d 1102, 401 N.E.2d 1177.) The Chins have not shown why Czekanski could not have been discovered sooner. In a discovery motion they asked for Czekanski's location, but the Partnership did not know. The Chins did not request a continuance during trial so that they might have time to find their witness.

Czekanski's affidavit supports the Chins' counterclaim and affirmative defense that the Partnership unilaterally changed an important part of the initial plans. This does not, however, overcome the trial court's main reason for denying relief under that theory: the Chins waived their right of approval by failing to respond to Halpern's calls and letters.

The decision on the motion was reserved to the trial court's discretion (*In re Estate of Goodman* (1976), 36 Ill. App. 3d 773, 344 N.E.2d 718), and we cannot say, under the circumstances here, that that discretion was abused.

Affirmed in part, reversed in part, and remanded.

GREEN, P.J., concurs.

JUSTICE WEBBER, concurring in part and dissenting in part:
Although I am less than totally convinced that a proper disposition has been made of the issues raised by Chins in their cross-appeal, especially with reference to another restaurant in the Centre, yet I will defer to the trial court on these matters and concur in the majority's holding on these. I cannot concur in their disposition of the question of Chins' liability for rent during the interim period between tenants and dissent on that point.

The majority speaks of the Parthenon and Giordano as "substitute tenants" and places great reliance on paragraph 14 of the Chin lease. In my judgment the operative word in paragraph 14 is "reletting." The principal question to be determined is the intention of the Centre in "reletting" to the Parthenon and Giordano. It is undisputed that

new leases were made with each of these entities, longer in time than the term of the Chin lease, and in Giordano's case, at a greater rental.

It seems to me that there is a qualitative difference between substituting a tenant under an existing lease and making an entirely new lease with the new tenant. In the former case, it would appear *prima facie* that the landlord was attempting to mitigate the damages; in the latter case, it becomes acceptance of the surrender of the former tenant and releases him from his obligations under the lease. Paragraph 14 of the Chin lease renounces any duty to mitigate and in a broad sense this holds the key to what the Centre was in fact doing.

The courts of Illinois have not pursued any consistent theory on mitigation. In *Reget v. Dempsey-Tegeler & Co.* (1968), 96 Ill. App. 2d 278, 280-81, 238 N.E.2d 418, the following general statement appears:

> "The majority rule in the United States is that the landlord has no duty whatsoever to mitigate damages in a case of this kind, even to the extent that he can arbitrarily refuse a suitable subtenant offered by the lessee. 31 ALR2d, p 831; 51 CJS, Landlord and Tenant, p 550, § 36; 32 Am Jur, Landlord and Tenant, § 412, p 338. The rationale is that the tenant cannot by his own wrong in abandoning the premises impose a duty upon the landlord. 32 Am Jur, § 519, p 423.
>
> Illinois does not follow the majority rule completely. There is a conflict in Illinois as to whether the landlord has a general duty to mitigate or a duty to mitigate only in those instances where the tenant has tendered a suitable subtenant. In West Side Auction House Co. v. Connecticut Mut. Life Ins. Co., 186 Ill 156, 57 NE 839, the court said: 'Upon abandonment of the leased premises by the tenant it was the right and the duty of the landlord to take charge of the premises, preserve them from injury, and if it could, re-rent them, thus reducing the damage for which the lessee was liable.' Id. at 161. See also Contratto v. Star Brewery Co., 165 Ill App 507; Hinde v. Madansky, 161 Ill. App. 216. However, later, and in our opinion, better-reasoned opinions have extended the duty to mitigate only to those instances where the tenant has tendered a suitable subtenant. Wohl v. Yelen, 22 Ill. App2d 455, 161 NE2d 339; Scheinfeld v. Muntz TV Inc., 67 Ill App2d 8, 214 NE2d 506. In Wohl, the court reviewed the law relating to whether a general duty to mitigate damages on abandonment exists.
>
> 'The same conflict exists in other jurisdictions. The majority

favor the rule against requiring the lessor to re-enter and use diligence in re-renting .... A minority apply a rule of mitigation similar to that used in other contracts ....

'Virtually all cases refusing to accept the rule of mitigation involve landlords who have not re-entered and have not been presented with acceptable tenants by the defaulting tenant. These cases therefore may be said to hold that a landlord need not seek out new tenants after the defaulting tenant abandons.' Id. at 463-464.' "

See the general discussion of the problem: Bulkeley, *Does a Landlord Have a Duty to Mitigate Damages When a Tenant Abandons During the Lease?* 68 Ill. B.J. 588 (1980).

It is interesting to note that the language in paragraph 14 of the Chin lease is with miniscule variations identical with the language found in *Hirsch v. Home Appliances, Inc.,* (1926), 242 Ill. App. 418, 420. In *Hirsch* the court found no duty to mitigate.

In the instant case, then, the lease itself renounces the duty to mitigate and *Hirsch,* almost on all fours so far as language is concerned (*mirabile dictu!*), states that as a matter of law there is no such duty. What, therefore, was the Centre doing? It made no demand on Chins for the payment of rent; it served no notice that it was seeking a substitute tenant; it never communicated to the Chins that it would hold them responsible for any deficiency in rent. What it did do, not once but twice, was to make a new lease with a different tenant. That was its choice and in my judgment was an abnegation of any intent to mitigate, notwithstanding it had no duty to do so.

The execution of the new leases was tantamount to an acceptance of Chins' surrender. The general rule is stated in 51c C.J.S. *Landlord & Tenant* sec. 125(8) (1968) as follows:

"Ordinarily the execution of a new lease for a term extending beyond that fixed in the original lease, with the tenant's consent, is an indication of an intent to accept the surrender, even if the original lease authorizes the landlord to relet on the tenant's account without thereby terminating the lease; but it is not conclusive of such intent.

A reletting by the landlord on his own account constitutes an acceptance of the surrender. So an unqualified taking of possession by the lessor and reletting of the premises by him, if done pursuant to the tenant's surrender, constitute an acceptance of the surrender and release the tenant; and where nothing is said as to the reletting, and the original lessee is not notified and does not consent, and there is no provision in the

lease with regard thereto, the general rule is that the reletting shows an acceptance of the surrender, although the contrary rule seems to prevail in some states, and the tenant is not thereby released from liability on the lease."

A similar statement is found in 49 Am. Jur. 2d *Landlord and Tenant* sec. 625 (1970):

"Consent to a surrender terminating liability for rent should not be implied from the mere fact of a reletting, in a jurisdiction which follows the view that the landlord is bound to reduce the damages resulting from a wrongful abandonment by the tenant by reletting the premises if possible. Conversely, in a jurisdiction which adheres to the general rule that a landlord is not required to attempt to relet the premises for the benefit of a tenant who has abandoned the premises wrongfully, the act of a landlord in reletting the premises, following an abandonment thereof, is not to be considered as indicating by itself an attempt on the part of the landlord to mitigate the damages for the benefit of the abandoning tenant, rather than as an acceptance of a surrender of the premises. On the other hand, the landlord's act in reletting for the purpose of minimizing the damages from a wrongful abandonment is undoubtedly proper, although not required, and does not necessarily constitute an acceptance of a surrender."

Clearly the rules on acceptance of surrender are no more hard-and-fast than those pertaining to mitigation, but under all the circumstances of this case the actions of the Centre indicate to me the former. Those actions, because of a dearth, even a total lack, of hard evidence of intent, are ambiguous, but they fit more closely into the mold of acceptance of surrender than into the pattern of mitigation. Although not specifically articulated by the trial court, I feel that this was the basis of its decision in denying to the Centre rentals for the interim period and it should be affirmed on that basis.

Since I feel that no calculation of rentals is required under the theory of acceptance, I need not reach the question of larger rent from Giordano, but I also dissent vigorously from the majority's cavalier rejection of *Wanderer v. Plainfield* (1976), 40 Ill. App. 3d 552. Mitigation, if it exists, must be fair and is a two-way street.