[No. 6868-4-III.   Division Three.   December 9, 1986.]

THOMAS F. HARGIS, JR., ET AL, *Respondents*, v. MEL–MAD CORPORATION, ET AL, *Appellants*.

*K. Denny Colvin,* for appellants.

*J. Tappan Menard* and *Gavin, Robinson, Kendrick, Redman & Pratt,* for respondents.

MUNSON, J.—Mel–Mad Corporation appeals the trial court's award of damages to Thomas F. and Patricia L. Hargis (Hargis) following Mel–Mad's abandonment of commercial property leased from Hargis.[1] Mel–Mad contends the trial court erred in: (1) awarding Hargis damages for delinquent rent while treating the lease as terminated; (2) refusing to credit against the damage award such rent as Hargis obtained under the new leases in excess of that due under the original lease; and (3) not properly valuing damages set off by Mel–Mad against Hargis based on Hargis' failure to notify Mel–Mad prior to auctioning off its equipment left on the leased premises. We affirm.

On November 14, 1974, Hargis leased certain commercial property to Mel–Mad for a term of 15 years, commencing May 15, 1975. Cecil and Eileen Mellinger, who signed on behalf of Mel–Mad, operated a Burger Chef restaurant on the premises.

In 1977, Mel–Mad sublet the premises to Mike Chambers, who continued operating the restaurant. The Hargis/ Mel–Mad lease was amended in December 1982 to decrease the rent to $1,643 per month. The Burger Chef went out of business on April 30, 1983. On May 20, Mel–Mad informed Hargis by letter that it was voluntarily surrendering the premises and would no longer continue to pay rent. In the letter, Mel–Mad asked Hargis to use best efforts to find a new tenant.

---

[1]The Residential Landlord–Tenant Act of 1973, RCW 59.18, is inapplicable as this action involves a commercial lease.

Hargis responded by letter on June 2, informing Mel–Mad that, as of June 13, the lease would be forfeited and Hargis would reenter and attempt to relet the premises. The letter provided further that Mel–Mad remained liable for delinquent rent and remodeling costs pursuant to section 38 of the lease.[2] The letter further advised Mel–Mad:

> If Mel–Mad does not remove its property and clean up the premises by June 13, 1983, Mr. Hargis [the landlord] will clean up the premises, and remove Mel–Mad's property. Pursuant to Section 38 of the lease, Mel–Mad will be liable for the cost of clean up, removal and storage of the property.

Hargis had no further communications with Mel–Mad, although it is undisputed that Hargis could have contacted Mel–Mad.

---

[2] Section 38 of the lease provides: "[I]f Tenant . . . default[s] in the performance of any of the other covenants, agreements, stipulations or conditions herein, and such violation or default shall continue for a period of ten (10) days after written notice by Landlord to Tenant of such violation or default, then without prejudice to any other remedies which Landlord might have, Landlord may, at its election, declare this lease forfeited and the said term ended, and re–enter the premises, with or without process of law, and to remove all persons or chattels therefrom. Landlord shall not be liable for damages by reason of such re–entry, but *notwithstanding such re–entry by Landlord, the liability of Tenant for the rent or other charges provided for herein shall not be extinguished for the balance of the term of this lease, and Tenant agrees to make good to Landlord any deficiency arising from a re–entry and re–letting of the premises at lesser rentals* and other charges than herein reserved and Tenant shall pay such deficiencies each month as the amount thereof is ascertained by Landlord. In case of such re–entry, Landlord may re–let the premises upon such terms as to it may seem fit and for a term which may expire either before or after the expiration date of this lease. It is further understood that Tenant will pay, in addition to the rentals and other sums agreed to be paid hereunder, such additional sums as the court may adjudge reasonable as attorneys' fees in any suit or action instituted by Landlord to enforce the provisions of this lease, or the collection of the rentals due Landlord hereunder. For the purposes of this Section, the rentals for the period after any such default shall, at the option of the Landlord, be deemed to be at a rate equal to the total of the minimum rentals and the percentage rental, payable by Tenant for the last preceding full lease year, but, if such event shall occur during the first year of this lease, then at a rate equal to the minimum and percentage rentals payable for such part year. *Upon re–letting, Tenant shall be immediately liable to pay to Landlord the cost and expense of re–letting and of such alterations and repairs as may be incurred by Landlord in readying the premises for re–letting.*" (Italics ours).

Prior to abandoning the premises, neither Mel–Mad nor its subtenant cleaned the premises. When Hargis reentered, the main floor was strewn with debris. The basement was full of junk and debris. The utilities, including electric power, had been disconnected for lack of payment; food which had been left in the walk–in refrigerators had begun to rot. Water had run out of the refrigerators into adjoining tenants' premises. All of the fluorescent light tubes had been removed.

Throughout the remainder of the summer and into the fall of 1983, Hargis attempted to relet the premises to other restaurateurs who could utilize the equipment left from the Burger Chef operation. He also attempted to lease the premises to a local clothing retailer; those negotiations were not productive.

After becoming apparent another restaurant was not going to move in, Hargis decided to remove the equipment to make the premises easier to rent. Because some of the equipment, including a grill, deep fryer, and ice cream machine had already been removed, Hargis was under the impression Mel–Mad was not interested in the remaining equipment. Hargis contacted Marion Pierce, an auctioneer, who sold the remaining equipment at auction on October 19, 1983. Prior to the sale, Hargis did not contact Mel–Mad in an attempt to have it remove the equipment; Mel–Mad received no notice of the sale. The auction netted $4,053.50.

In late fall, Hargis employed a real estate broker and by December 1983, had a verbal commitment from Volume Shoes to lease the premises. Following several months of negotiations, Hargis entered into a 10–year lease with Volume Shoes for a portion of the leased premises. The terms of the lease provided for rent of $2,310 per month for the first 3 years; $2,657.33 per month for the next 4 years; and $3,056 per month for the last 3 years. Remodeling was required to make the premises suitable for a shoe store. Volume Shoes took possession of the premises in September 1984. The remaining portion of the premises was leased in August 1984, for 3 years to the Jolly Joker for $178 per

month. The largest portion of the premises remained vacant from June 13, 1983, until September 1984.

Hargis commenced the instant action on November 8, 1983, seeking damages for delinquent rent, unpaid utility bills, cleanup costs, the real estate broker fees, and remodeling costs associated with reletting the premises. Hargis' motion for partial summary judgment was granted on November 16, 1984. The court awarded Hargis damages covering the delinquent rent, unpaid utility bills, cleanup costs, brokerage fees, and remodeling costs. The court also awarded Hargis attorney fees and costs. Mel–Mad was given a credit of $4,342.90 for the money obtained from the auction and subsequent sale of the Burger Chef signs.

After trial on the remaining issues, the court awarded Hargis total damages of approximately $50,000, and offset the $4,342.90 obtained by Hargis through the sale of the restaurant equipment and signs. It did not give Mel–Mad an offset for the increased rent Hargis was to receive under the new leases. Finally, the court awarded Hargis attorney fees and costs pursuant to section 38 of the lease. Mel–Mad moved for reconsideration; that motion was denied; this appeal followed.

Mel–Mad initially contends that upon abandonment of the lease, Hargis had to choose whether to treat the lease as totally forfeited or ongoing. Mel–Mad contends the evidence demonstrates Hargis did not terminate the lease, but rather relet for Mel–Mad's benefit and, therefore, the court erred in refusing to credit it for the future excess rent Hargis receives under the new leases. Alternatively, it argues if the lease was, in fact, forfeited, that forfeiture occurred on June 13, 1983; thus, the court erred in awarding Hargis rent accruing after that date.

Neither party denies that Mel–Mad effectively abandoned the leased premises on June 13, 1983. Traditionally, a tenant's voluntary abandonment of leased premises conferred upon the landlord the option

(1) to complete surrender and termination by re–entering for his own account; (2) to do nothing and so to keep the

leasehold, and the tenant's duty to pay rent, going; or (3) to re–enter and re–let "for the tenant's account," charging to the tenant any difference between his agreed rent and the rent received from the replacement tenant.

R. Cunningham, W. Stoebuck & D. Whitman, *Property* § 6.80, at 403 (1984); Restatement (Second) of Property § 12.1(3), at 385 (1977).

Washington, however, adheres to a minority view requiring the landlord to mitigate the tenant's damages by reletting either for his or her "own account" or for the "tenant's account." *Pague v. Petroleum Prods., Inc.,* 77 Wn.2d 219, 223, 461 P.2d 317 (1969); Stoebuck, *The Law Between Landlord and Tenant in Washington: Part II,* 49 Wash. L. Rev. 1013, 1083 (1974); *see also Myers v. Western Farmers Ass'n,* 75 Wn.2d 133, 136, 449 P.2d 104 (1969); *Exeter Co. v. Samuel Martin, Ltd.,* 5 Wn.2d 244, 249, 105 P.2d 83 (1940). Here, the conduct of the parties clearly indicates they intended to treat the lease as terminated or forfeited. *Moore v. Northwest Fabricators, Inc.,* 51 Wn.2d 26, 29, 314 P.2d 941 (1957). We conclude the lease was surrendered, as a matter of law, on June 13, 1983; Hargis reentered for his own account. *Moore,* at 29–30.

■ Mel–Mad correctly contends when a lease is surrendered or forfeited, all liability for unaccrued rent generally ends. *Heuss v. Olson,* 43 Wn.2d 901, 905, 264 P.2d 875 (1953) (and cases cited therein); Restatement (Second) of Property § 12.1, comment *i,* at 390–91 (1977). However, there are exceptions to this rule; *Heuss,* at 905, provides:

> It is only when the forfeiture or surrender is qualified, *as in the case of a lease which expressly saves the lessor's right to also recover damages based on unaccrued rent (Metropolitan Nat. Bank v. Hutchinson Realty Co.,* 157 Wash. 522, 289 Pac. 56 [(1930)]), or where the notice of forfeiture communicates to the lessee the lessor's intention to hold the lessee for such damages, notwithstanding the forfeiture, that the lessee is not released from liability therefor.

(Some citations omitted. Italics ours.)

Here, section 38 of this lease provides in pertinent part:

Landlord may, *at its election,* declare this lease *forfeited* and the same term ended, and re-enter the premises, with or without process of law, and to remove all persons or chattels therefrom. Landlord shall not be liable for damages by reason of such re-entry, *but notwithstanding such re-entry by Landlord, the liability of Tenant for the rent or other charges provided for herein shall not be extinguished for the balance of the term of this lease* . . .

(Italics ours.) This section expressly entitled Hargis to future rent even if the lease was surrendered. Therefore, this case falls within the exception enunciated in *Metropolitan Nat'l Bank v. Hutchinson Realty Co.,* 157 Wash. 522, 529, 289 P. 56 (1930), where the court stated:

[T]here is nothing illegal or improper in an agreement that the obligation of the tenant to pay all the rent to the end of the term shall remain notwithstanding there has been a re-entry for default; and if the parties choose to make such an agreement there is no reason why it should not be held to be valid as against both the tenant and his sureties." 16 R. C. L., p. 1138, § 659.

The trial court correctly awarded Hargis the rent which accrued from the date of surrender, June 13, 1983, until the premises were substantially relet, September 1984.

Mel-Mad next contends the trial court applied the wrong measure of damages; the court should have allowed it a setoff against the damage award since the rent from the new tenants would exceed any loss incurred by Hargis by Mel-Mad's abandonment. Thus, allowing Hargis to retain the excess rent without a setoff violates the rule that compensatory damages are designed merely to put the injured party in as good a position as if the contract had been performed; consequently, gains accruing to the injured party (Hargis) that would not have occurred but for Mel-Mad's breach constitute a windfall and should be deducted from the amount the injured party would otherwise recover. 5 A. Corbin, *Contracts* § 1039, at 241 (1964). Under the circumstances of this case, that rule is not controlling.

Mel-Mad would be entitled to a setoff for the excess rent

if Hargis had treated the lease as continuing and had, thus, entered and relet for Mel–Mad's account. Restatement (Second) of Property § 12.1, comment *i,* at 390–91 (1977). That comment provides:

> The landlord may decline to accept the tenant's surrender of the lease, but notify him that he is attempting to rent the leased property for the tenant to mitigate the tenant's loss. . . . [T]he tenant is liable for the difference between the rental the tenant was obligated to pay and the amount received from the new tenant, and is also liable for the reasonable costs incurred by the landlord to procure a new tenant. . . . In this situation, if the landlord relets for an amount in excess of the rent reserved in the original lease to the tenant, he must account to the tenant for such excess.

■ However, that rule is inapplicable here where the lease is treated as surrendered or forfeited.[3] Hargis was not awarded damages based on rental values from September 1984 onward as obviously it suffered no loss after that date. Rather, it recovered damages based on the payments not made by Mel–Mad for the 14–month period from the time of forfeiture until the reletting of the premises. A defaulting tenant is not entitled to a credit for the excess rent the landlord receives from a subsequent tenant toward the unpaid rent owed by the original tenant for the period of time the property was vacant. *Spitzer v. Selig Enters.,* 140 Ga. App. 156, 230 S.E.2d 121, 124 (1976); *Johnstowne Centre Partnership v. Chin,* 110 Ill. App. 3d 595, 442 N.E.2d 680, 684 (1982), *rev'd on other grounds,* 99 Ill. 2d 284, 458 N.E.2d 480 (1983); *Waxman Indus., Inc. v. Trustco Dev. Co.,* 455 N.E.2d 376, 379 (Ind. Ct. App. 1983); *Trick v. Eckhouse,* 82 Ind. App. 196, 145 N.E. 587, 588 (1924); *D.H. Overmeyer Co. v. Blakeley Floor Covering, Inc.,* 266 So. 2d 925, 927 (La. Ct. App. 1972); *N.J. Indus. Properties, Inc. v. Y.C. & V.L., Inc.,* 100 N.J. 432, 495 A.2d

---

[3]*Dalamagas v. Fazzina,* 36 Conn. Supp. 523, 414 A.2d 494 (1979) and *Wanderer v. Plainfield Carton Corp.,* 40 Ill. App. 3d 552, 351 N.E.2d 630 (1976), cited by Mel–Mad, are distinguishable; in those cases, the landlords relet on the tenants' behalf.

1320, 1328 (1985); *Wilson Laundry Co. v. Joos,* 200 Pa. Super. 595, 189 A.2d 917, 919 (1963).

Likewise, Mel–Mad is not entitled to set off the excess rent against the costs incurred by Hargis to attract the new tenants. Our decision rests on several rationales. First, Mel–Mad's damages are, in fact, mitigated to the extent it was relieved from further rent payments from September 1984 through May 1990. Second, crediting the tenant's obligation to pay with the greater rent is unfair as the possibility of the landlord's receiving this future rent is speculative. Third, the landlord should not be made to bear immediate out–of–pocket losses, while the receipt of the new rent, even assuming the new tenant does not breach, is years away. Finally, as expressed by the court in *N.J. Indus. Properties, Inc.,* at 448–49:

> If there is an inequity that, by virtue of the facts of this case, must fall on either of the parties, we have decided that it should fall on the party who breached the lease. The defaulting tenant should not get the benefit of his breach. It is clear that the landlord promptly moved to mitigate the tenant's damages. Fairness dictates that excess rent belongs to him and not the defaulting tenant. When a tenant breaches a lease and abandons the premises, it is the landlord who is left with an empty building, the concomitant risks of fire, theft, and vandalism, and the burden of finding another tenant. We therefore hold that notions of fairness preclude the breaching tenant from benefitting from his breach in this case.

Thus, we conclude the trial court correctly held Mel–Mad was not entitled to set off the excess rent against the damages incurred by Hargis.

Finally, Mel–Mad argues the court erred in not awarding it damages for Hargis' alleged violation of the personal property lien foreclosure statute. RCW 60.10; *see* RCW 60.72. Although unclear from the record whether Hargis proceeded under that provision, our analysis assumes it did.[4] RCW 60.10.030(3) provides in part:

---

[4]Whether Hargis intended to claim a landlord lien on the equipment and fore-closed pursuant to RCW 60.10.030 is unclear because RCW 60.72.010 provides no

Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the lien holder to the lien debtor . . .

Here, it is undisputed that Hargis failed to give Mel–Mad notice of the auction. RCW 60.10.060 provides that when the lessor fails to notify the lessee of such a sale, the lessee "has a right to recover from the lien holder any loss caused by a failure to comply with the provisions of this chapter." The record indicates the court allowed Mel–Mad this remedy. Thus, the crucial contention becomes whether the court erred in fixing Mel–Mad's loss at $4,342.90.

Mel–Mad presented several witnesses who testified the resale value of the used equipment was between $20,000 and $50,000. However, some of the witnesses had no idea as to the condition of the equipment at the time of sale; there was also testimony some of the equipment was in poor condition. The record indicates the resale value of such equipment after being removed from the premises falls substantially. Moreover, Mr. Pierce, the auctioneer, testified he had sold similar equipment before and that the price received here was comparable. The court had the opportunity to listen to these witnesses and assess their credibility; it chose to believe Mr. Pierce. This court will not disturb that determination. *Davis v. Department of Labor & Indus.*, 94 Wn.2d 119, 124, 615 P.2d 1279 (1980). Since $4,342.90 was the actual "loss" incurred by Mel–Mad, the trial court did not err in using that figure.

Mel–Mad also contends the auction was not a commercially reasonable way to sell the equipment. Mel–Mad's witnesses testified a dealer of such equipment would have paid a higher price. However, RCW 60.10.070 states: "The

writing or recording is necessary to create or perfect such a lien. Hargis contends he did not sell the equipment pursuant to those provisions; rather, he simply removed and sold the equipment in order to re–rent the premises.

fact that a better price could have been obtained by a sale . . . in a different method from that selected by the lien holder is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner." Moreover, Mel–Mad must assume some responsibility for the manner in which the equipment was sold as it was asked to remove the property. When it did not, Hargis, after holding it for 4 months, sold the equipment at auction. Given these facts, we cannot state that this method of selling the equipment was unreasonable.

The judgment is affirmed. Hargis is awarded attorney fees of $4,950 on appeal.

McInturff, A.C.J., and Thompson, J., concur.