[No. 44010. En Banc. October 28, 1976.]

WILLIAM DIEDRICK, SR., ET AL, *Appellants*, v. SCHOOL DISTRICT NO. 81, ET AL, *Respondents.*

*William J. Powell,* for appellants.

*Robert W. Winston, Jr.,* and *Winston, Cashatt, Repsold, McNichols, Connelly & Driscoll,* for respondents.

UTTER, J.—On April 14, 1972, for reasons of economy due to the failure of special levy elections, Spokane School District No. 81 was forced to nonrenew a large number of certificated teachers, and to reduce to teaching positions in accordance with an administrative reorganization plan certain administrative and supervisory (A&S) personnel. Subsequently, many of the adversely affected certificated employees commenced a lawsuit in Superior Court challenging the legality of the school board's action.

The trial court entered a judgment which provided, insofar as relevant, that (1) the claims of nine A&S plaintiffs who were reduced to teaching positions were dismissed with prejudice; (2) twenty-four plaintiffs were awarded damages aggregating $251,103.28, plus interest; (3) certificated teachers Richard Drees and Marjorie Rell were denied relief; (4) David Yost, a certificated teacher, was denied certain special damages; and (5) plaintiffs were awarded attorney's fees in the amount of $10,000 plus costs. These plaintiffs instituted the instant appeal to contest the trial court's judgment to the extent that it denied them the relief requested.

The defendant school district cross-appealed to challenge

the plaintiffs' entitlement to the damages awarded. We affirm all portions of the trial court's judgment except the amount of its award of attorney's fees to appellants.

In January 1972 the district projected budget needs in excess of available funds. It determined that a special levy was required to meet the projected budget needs for the 1972-73 school year. A special levy election was held on February 22, 1972, which failed to secure the necessary votes. Following the failure of the first special levy election, a second was scheduled for April 11, 1972. In view of the possibility of a second failure, the board of directors advised the superintendent and the school administration to begin preparation of alternative measures should the second levy fail.

The board advised the school administration that an administrative reorganization plan for the reduction of A&S personnel (which apparently already had been contemplated) should be prepared. The criteria to be recommended to the board by the administration for reduction of certificated employees was directed to be based primarily on *performance*, namely competency, with seniority a factor to be considered only if all other considerations taken into account were equal.

On April 5, 1972, Dr. Ayars, the superintendent, submitted a proposed plan, which was adopted by the board on April 8, 1972, for the administrative reorganization and reduction of A&S staff as requested.

On April 6, 1972, Dr. Ayars submitted to the board recommended measures to be taken in case of a second levy failure. The cover letter accompanying the recommendations stated, in part:

> In making required staff cuts we would plan to retain the
> . people to fill the remaining jobs on the basis of qualifications by *experience and training*, by merit as determined by regular evaluation procedures and, finally, by *seniority*, other factors being equal.

(Italics ours.) Attached to the letter were the proposed guidelines to be used to determine which teachers and A&S

personnel would be nonrenewed or reduced to teaching positions. The recommended guidelines adopted by the board on April 12, 1972, following the failure of the second special levy election, provided that a relative rank order was to be established by using the following criteria: (1) Form A of the personnel evaluation procedure was to be used as a guide; (2) the program needs of the district for particular *skills and training* were to be given consideration along with the relative rank order; (3) those people who were removed from A&S positions were to be offered employment on regular teaching or other certificated contracts; and (4) *seniority* was to be given consideration if all other factors were equal.[1]

On March 29, 1972, the principals of the various schools in the district were requested by the director of personnel to prepare a rank order of their respective staffs pursuant to the proposed criteria which the board eventually

---

[1]"PROPOSALS FOR REDUCTIONS IN PROGRAM MADE NECESSARY BY LEVY FAILURE

"We recommend in principle the 'Budget Reductions' outlined at the special meeting of April 8, 1972 in the amount of $5,482,322, not including the closure of North Central High School, and involving the reduction of an estimated 154.5 classified positions and 236 certificated positions.

"*Guidelines to be Used in Non-renewal of Certificated Employee Contracts*

"We recommend that the following guidelines be approved to be used in determining those certificated employees whose contracts will not be renewed in 1972-73 as a result of the levy failure. These are recommended to give consistency to such reductions and to avoid any charges of being 'arbitrary and capricious':

"1. That a relative rank order be established on the basis of the supervising principal's and/or special leader's ranking for which Form A of our personnel evaluation procedure is to be used as a guide. (This year's evaluations cannot be used because they are not scheduled for completion until May 7.)

"2. That the needs of the District for particular skills and training to fill specific positions be given consideration along with the relative rank order.

"3. That those people who are being removed from A&S positions be employed on regular teaching or other certificated contracts because they originally were selected for an A&S assignment based on superior performance in their previous positions.

"4. That seniority be given consideration, other factors being equal."

adopted. In compiling the rank order, they were requested to give consideration to the evaluative factors listed in the district's "Professional Growth Conference Summary Form A."[2] The various factors to be taken into account listed on this form were: (1) ability to assume responsibility; (2) effective relationship to others on staff; (3) regular attendance; (4) emotional stability and self-control; (5) appropriate appearance; (6) proficiency in communication skills; (7) punctuality; (8) teacher-pupil relationship; (9) ability to obtain courteous classroom attention; (10) plans worked —long range and daily; and (11) keeps room organized, attractive, and interesting. The letter of March 29, 1972, suggested that the principals also give consideration to leadership, creativity, and dedication to tasks in place of items 8, 9, and 11 found in the form.

Between March 29, 1972 and April 3, 1972, rank orders of the teaching staff and A&S personnel, except the school principals, were compiled by the principals and other supervisory personnel. A rating committee composed of seven central school administrators[3] also met and ranked the district's principals in accordance with the proposed guidelines or criteria. Once the initial ranking process was completed, a master list was compiled by the district's central administration. The A&S personnel and teaching staff were given district-wide rank order numbers which theoretically were designed to reflect the *performance* of all certificated employees as educators and teachers. The rank order numbers were used to determine which A&S personnel would be reduced to teaching positions and which teachers would be nonrenewed. The district's central administration then applied criteria 2, 3, and 4 of the proposed guidelines, in addition to the ranking process that had occurred already

[2]Form A originally was adopted by the board pursuant to statute for the purpose of annually evaluating all certificated employees. RCW 28A.67.065.

[3]The committee members were the superintendent, the deputy superintendent, the assistant superintendent for instruction, the assistant superintendent of public personnel services, the personnel director, the assistant director of personnel, and the assistant director of curriculum.

on the basis of criterion 1, in making the final determination of which individuals to nonrenew or reduce to teaching positions.

Following the second levy failure, the board issued notices of nonrenewal to the lowest ranked teachers and notices of nonrenewal accompanied with an offer of a teaching position to the lowest ranked A&S personnel.

*Defects in Notice of Nonrenewal*

The notice of nonrenewal addressed to the A&S personnel who were nonrenewed and reduced in status stated:

You are hereby notified that at the regular meeting of the Board of Directors of Spokane School District No. 81 on April 12, 1972, a resolution was adopted not to renew your existing contract of employment for the school year 1972-73.

The cause for this is that the said Board of Directors has determined and resolved after careful consideration of the finances of the District, that your contract will not be renewed for reasons of economy.

For the school year 1972-73, we are prepared to submit for your acceptance a contract ——————————————.

RCW 28A.67.070[4] which established the procedure for nonrenewal of certificated employees, provided, in relevant part:

Every board of directors determining that there is probable cause or causes that the employment contract of an employee should not be renewed by the district for the next ensuing term shall notify that employee in writing on or before April 15th preceding the commencement of such term of that determination of the board of directors, which notification shall specify the cause or causes for nonrenewal of contract. . . . Any decision not to renew such employment contract shall be based solely upon the cause or causes for nonrenewal specified in the notice of probable cause to the employee and established by a preponderance of the evidence at the hearing to be sufficient cause or causes for nonrenewal.

Appellants primarily contend the notice of nonrenewal addressed to the A&S personnel was defective because: (1) it failed to notify the certificated employee of probable

---

[4]Laws of 1969, 1st Ex. Sess., ch. 34, § 12, p. 581.

cause for nonrenewal, but instead constituted a final determination; (2) the phrase "reasons of economy" stated in the notice did not apprise the employee of the exact reasons for his nonrenewal contrary to RCW 28A.67.070; and (3) the notice did not otherwise indicate the specific standards by which the A&S appellants were selected for reduction to teaching positions.

■ The phrase "reasons of economy" adequately informed the A&S employees of the basic nature of the *probable cause* for nonrenewal. There is no showing that the failure of the notice to specify the exact reasons for nonrenewal as opposed to the more general statement "reasons of economy" prejudiced the A&S appellants. They were given ample opportunity to demonstrate at the trial court level that there was not *sufficient cause* for nonrenewal. The form of the notice did not result in the denial of any statutory right of the A&S appellants.[5]

■ While the notification must specify generally the cause or causes for nonrenewal of a contract, RCW 28A.67.070 does not require each element of the criteria chosen by the board for nonrenewal purposes be stated in the notice. *Pierce v. Lake Stevens School Dist. 4,* 84 Wn.2d 772, 778, 529 P.2d 810 (1974).[6]

---

[5] Notices similar to that involved in this case were approved in *Hill v. Dayton School Dist. 2,* 85 Wn.2d 204, 532 P.2d 1154 (1975), in *Pierce v. Lake Stevens School Dist. 4,* 84 Wn.2d 772, 780-82, 529 P.2d 810 (1974), and in *Boyle v. Renton School Dist. 403,* 10 Wn. App. 523, 525, 518 P.2d 221 (1974). These cases also involved a failure of special school levies which resulted in a need to curtail programs and reduce personnel.

[6] On April 10, 1972, the superintendent, Dr. Ayars, addressed to all certificated staff members a letter which explained the criteria and how they were to be used:

Members of the certificated staff may quite naturally be expected to be anxious as to how the retention or release of individual staff members will be determined in the event of an actual crisis. The underlying guideline will be that of *program need.* That is, in view of a severely curtailed educational program, whose services will be required? There are three main considerations here: (1) What programs and services will be completely eliminated? (2) What programs and services will be severely curtailed? and (3) What

## Sufficient Cause for Nonrenewal

 It is further argued that sufficient cause did not exist to nonrenew and reduce to teaching positions A&S appellants Harris, Danke, and Schoening because they effectively continued to perform the same jobs they had been assigned prior to the nonrenewal. Their contention fails on two grounds: (1) The record reflects they were not *in fact* performing exactly the same jobs or functions to the same extent as they performed prior to the nonrenewal; and (2) a district properly may reduce salaries and require the same job to be performed, or it may abolish and consolidate employment positions and impose the duties on other employees where done in good faith and in a manner consistent with the district's economic exigencies or other re-

---

pupil:teacher ratios can be maintained under conditions of severe budgetary crisis?

The procedure involves a careful analysis to determine, within the limitation of overall staffing ratios, which certificated staff members must be retained to conduct the limited program that will be maintained in 1972-73. In identifying the certificated staff personnel most competent to so conduct the limited program, principals and supervisors have been asked to make their evaluations on the basis of the District's evaluation form. Criteria of importance in making selections include:

1. Verified professional preparation of the individual to teach the subject matter or grade level at hand. (This will include, of course, valid certification by the state of Washington to teach that subject or at that grade level.) The professional preparation to be considered will be those college and university credits and those authorized in-service credits which are on file at the personnel office.
2. Verified professional experience of the individual in the subject matter or grade level at hand. The professional experience to be considered will be that which is a matter of record at the personnel office.
3. Seniority status of the individual as computed for purposes of current placement on the district's salary schedule, to become a factor when other factors are equal.

 It is important to note that seniority will not be the sole factor in determining staff retention. Of prime consideration will be the individual's qualifications in terms of professional preparation and *actual teaching experience* in the subject or grade level of concern. In cases where such qualifications are judged to be equal, seniority will become a critical factor.

quirements. *Cf. Rooney v. Everett,* 59 Wn.2d 172, 367 P.2d 149 (1961) (municipal employment); *State ex rel. Morris v. Seattle,* 5 Wn.2d 267, 269-70, 104 P.2d 1118 (1940).

### Due Process Violated by Criteria for Nonrenewal

The A&S appellants next urge that the adoption and application of criteria in selecting them for reduction to teaching positions violated due process concepts.

■ The due process clause of the Fourteenth Amendment requires that deprivation of life, liberty, or property be preceded by notice and an opportunity for a hearing appropriate to the nature of the case, with the opportunity for the hearing granted at a meaningful time in a meaningful manner. *Olympic Forest Prods., Inc. v. Chaussee Corp.,* 82 Wn.2d 418, 422-23, 511 P.2d 1002 (1973). Due process is not a mechanical instrument or yardstick, however, it is "a delicate process of adjustment inescapably involving the exercise of judgment by those whom the Constitution entrusted with the unfolding of the process." *Joint Anti-Fascist Refugee Comm. v. McGrath,* 341 U.S. 123, 163, 95 L. Ed. 817, 71 S. Ct. 624 (1951) (Frankfurter, J., concurring).

■ Appellants first contend due process requires the establishment of *objective criteria* for nonrenewal purposes. *Singleton v. Jackson Municipal Separate School Dist.,* 419 F.2d 1211 (5th Cir. 1970) and *Rolfe v. County Bd. of Educ.,* 391 F.2d 77 (6th Cir. 1968), cited as support for this contention, do not apply. To implement a school desegregation plan, *Singleton* required school districts to adopt objective and reasonably nondiscriminatory standards in the dismissal or demotion of school personnel. *Rolfe,* which involved allegations of racially discriminatory discharge of school teachers, held teachers must be judged for continued employment by definite objective standards with all other teachers in the system. Neither case holds that *due process requires only objective criteria* be used to effect the nonrenewal of teachers within a school district for reasons of economy due to the failure of special levies. There is no contention raised or evidence in the record that the nonre-

newals involved in the instant case were the result of racially discriminatory motives.

Appellants further contend that they were denied due process because they effectively were compared only with others in their own school or building and not with the certificated staff throughout the entire school district. *Rolfe v. County Bd. of Educ.*, *supra*, discussed previously and cited to support this contention, does not address this issue. Similarly, *North Carolina Teachers Ass'n v. Asheboro City Bd. of Educ.*, 393 F.2d 736 (4th Cir. 1968), cited by appellants, is inapplicable. There, the issue involved the requirements of the Fourteenth Amendment in regard to teacher displacement and discharge upon the reorganization of a school system to eliminate racial discrimination.

Appellants also contend *due process* was violated because (1) Form A, upon which the ranking process initially was performed, was not designed to reduce staff on the basis of professional competency; and (2) the criteria were not uniformly applied.

In the absence of statutorily prescribed criteria or evidence that the board acted arbitrarily, capriciously, or contrary to law, the authority cited by appellants fails to establish due process was violated by the board's choice of or the application of the criteria in the instant case.

### Criterion 1 Included
### Experience, Training, and Seniority

Respondent also attacks the court's findings insofar as the factors "experience, training and seniority" found in Dr. Ayars' cover letter of April 6, 1972, were held to be a part of criterion 1 of the guidelines. Respondent argues that (1) the guidelines adopted by the board constituted the *only* criteria, or alternatively (2) "experience and training" were, in fact, used within the framework of the guidelines under criterion 2. We disagree. The record supports the trial court's finding that criterion 1 was amplified by and included "experience, training and seniority." Substantial evidence to support this finding is found in various portions of the record.

Appellants requested respondent to admit that the guidelines constituted "the only criteria ever adopted by Board resolution . . . for determining what certificated employees would not be renewed for 1972-73." Respondents denied that the guidelines constituted the "only criteria ever adopted by Board resolution." They further indicated two exhibits constituted "criteria *in addition to* that contained" in the guidelines adopted by board resolution on April 12, 1972. (Italics ours.) The first was Dr. Ayars' letter of April 6, 1972, which dealt with the recommended measures to be taken in case of levy failure. The district, in contradistinction to its position taken on appeal, admitted that experience, training, and seniority constituted criteria *in addition to* those adopted by board resolution. A reasonable inference is that these factors were to be taken into account in conjunction with Form A found in criterion 1 because criteria 2 and 4 already referred to "skills and training" and "seniority."

During cross-examination, the chairman of the board indicated that, in measuring performance, experience and training were matters to be considered in conjunction with Form A. Dr. Ayars, in a letter directed to all certificated staff members, dated April 10, 1972, inferentially indicated that, in compiling the initial rank order, the criteria of importance included professional preparation, experience and seniority.[7] The admission by the respondent (that the criteria were not solely limited to those adopted by board resolution), Mr. Barnes' testimony, and the letter of April 10, 1972, from Dr. Ayars to all certificated staff, constitute substantial evidence upon which the trial court could reasonably have found that "experience, training and seniority" were part of criterion 1 which was used to compile the rank order.

*The Administrative Reorganization Constituted*
*an Unlawful Delegation of the*
*Board's Authority*

Appellants next contend that the board's failure to

---

[7] See footnote 6.

specify criteria for determining which administrative positions were to be chosen for reduction to teaching positions constituted an unlawful delegation of authority. This contention lacks merit.

In *Pierce v. Lake Stevens School Dist. 4*, 84 Wn.2d 772, 784, 529 P.2d 810 (1974), the court stated:

> Not only was it proper for the school directors to utilize and rely upon the services of their administration in determining which teaching positions should be eliminated and which programs should be curtailed to meet the financial crisis, it would appear to be the only practical manner in which they could gather the information necessary to make an intelligent judgment.

The board did not violate the holding of *Noe v. Edmonds School Dist. 15*, 83 Wn.2d 97, 103, 515 P.2d 977 (1973), which noted that a school board may not "divest itself of powers and duties placed within its *exclusive control* by statute." The decision to reduce the number of teaching staff positions and to reduce the number of A&S personnel according to an administrative reorganization plan was made by the board. The specifics of the plan properly were left to the expertise of the district's administrators. *See Smith v. Greene*, 86 Wn.2d 363, 372, 545 P.2d 550 (1976).

### Damages Awarded to Richard Drees

Richard Drees urges the court failed to allow him the proper amount of damages.

Mr. Drees' salary for 1972-73, had he not been nonrenewed, would have been $13,583 for a standard 183-day teaching contract. He obtained employment at another school district in Rainier at a salary of $16,000 for a 225-day teaching contract. The trial court denied him damages on the basis that the $16,000 salary should be offset against his loss of pay from the defendant district. Mr. Drees contends that, since he worked an additional 42 days, he received $3.11 less per day at his new employment than he would have received had he remained in the employ of the defendant district. He claims that the decision of the trial court to offset his loss in pay, in effect, penalized him for obtaining a job of longer duration. We disagree. The gen-

eral measure of damages for breach of contract is that the injured party is entitled (1) to recovery of all damages that accrue *naturally* from the breach, and (2) to be put into as good a position *pecuniarily* as he would have been had the contract been performed. *Rathke v. Roberts*, 33 Wn.2d 858, 866, 207 P.2d 716 (1949); *see McAnulty v. Snohomish School Dist. 201*, 9 Wn. App. 834, 838, 515 P.2d 523 (1973). The court, in its oral opinion, found that irrespective of the contract teaching period, Mr. Drees' employment in Spokane and Rainier was on a full-time basis. As such, Drees was not harmed.

Mr. Drees also contends that the court erred in failing to award him other items of special damage. It is Drees' theory that, *but for* the nonrenewal of his contract, such expenses would not have been incurred.[8] The costs which the trial court declined to award the appellant did not flow *naturally* from the invalid nonrenewal of his contract, but basically were related to general expenses of living and in choosing to reside in Olympia and accept employment in Rainier.

### Attorney's Fees

■ Appellants next contend the court abused its discretion in its award of attorney's fees. In its oral opinion, the court stated it agreed with expert testimony to the effect that reasonable attorney's fees should be $30,000. Nevertheless, it awarded appellants' attorney's fees in the sum of $10,000, apparently because the board acted reasonably and in good faith. The fact that the board acted reasonably and

---

[8]The court awarded damages for the following: (1) placement fee, $800; (2) transcript fees, $24; (3) travel for interviews, $266; (4) closing costs on sale of home, $1,127.51; (5) moving costs for truck and trailers, $179.85. The trial court disallowed the following alleged damages: (1) costs incurred while looking for work, which included phone calls, meals, and lodging, $171.06; (2) expenses in finding a home, which included travel, meals, lodging, and a deposit on a house, $276; (3) costs incurred due to the separation of Mr. and Mrs. Drees for a 2-month period, which included rental of an apartment in Olympia, meals, and other expenses, $1,650; (4) other moving expenses which included two return trips to Spokane, phone calls, cost of clean-up of house for sale, and rental cars, $1,029.67; and (5) increased cost of travel to work and of living in Olympia, $2,096.

in good faith does not provide the trial court with a justifiable basis for reducing appellants' attorney's fees as would exist if an appeal were found to be frivolous. The trial court is reversed and attorney's fees are awarded in the amount of $30,000.

## Substantial Evidence
## To Support the Findings

The only remaining meritorious contentions revolve around the question of whether there is substantial evidence in the record to support the trial court's findings and conclusions.

Appellants contend that (1) the cause stated in the nonrenewal notice did not exist because the school district had underestimated its unrestricted cash and actual revenue by approximately $3 million and, therefore, had sufficient funds on hand; (2) the court erred in concluding that the evaluative criteria were uniformly applied to the nine A&S appellants who were reduced to teaching positions; (3) David Yost should have been awarded damages by the trial court for an ulcer which allegedly was caused by the nonrenewal of his contract; and (4) Marjorie Rell had not waived her right to damages for the 1972-73 contract year by requesting voluntary retirement.

The respondent on cross-appeal assigns error to the trial court's finding that staff reductions, personnel attrition, and actual revenue were underestimated at the time the board determined to nonrenew the certificated employees.

We find substantial evidence in the record to support the trial court's findings to which error has been assigned by both appellants and respondent.

The decision of the trial court is affirmed except for modification of its award of attorney's fees.

STAFFORD, C.J., and ROSELLINI, HUNTER, WRIGHT, and HOROWITZ, JJ., concur.

HAMILTON and BRACHTENBACH, JJ., concur in the result.