[No. 6348-8-III. Division Three. July 2, 1985.]

KWIK–LOK CORPORATION, *Appellant,* v. ROBERT F. PULSE, ET AL, *Respondents.*

*P. Douglas House, John M. Woodley,* and *Woodley & Thurston,* for appellant.

*Ross R. Rakow* and *Rakow & Hanson,* for respondents.

McINTURFF, J.—Kwik–Lok Corporation appeals from a judgment in favor of Robert F. Pulse for $32,130 for past damages, plus the additional sum of $32,473 for future damages. At issue is the enforceability and duration of a letter signed by Jerre Paxton, president of Kwik–Lok, which granted Mr. Pulse free breeding rights to two thoroughbred stallions.

Kwik–Lok and Mr. Pulse were engaged in several horse ventures during 1973. In addition to Mr. Pulse's duties as manager of the Yakima Stallion Station owned by Kwik–Lok, the parties shared ownership of several horses. One of those horses was Canadian Gil, a thoroughbred stallion purchased in January 1973. Both Kwik–Lok and Mr. Pulse had a financial interest in the stallion. A second horse, Drum Fire, was located by Mr. Pulse and purchased for Kwik–Lok. Mr. Pulse was to have acquired a financial

interest in Drum Fire, but the horse was syndicated among three related Kwik–Lok corporations.

On December 10, 1973, after Mr. Pulse had been terminated as the station manager, the parties met to end their association with respect to the individual horses. Mr. Pulse, in exchange for the return of his initial investment in Canadian Gil, signed a bill of sale transferring ownership to Kwik–Lok. The bill of sale was given to Mr. Paxton at the same time he gave Mr. Pulse the following letter:

December 10, 1973

Mr. Robert Pulse
303 Ahtanum Road
Yakima, Wash.

Dear Bob:          Ref: File 001

We hereby grant you two (2) free breedings a year to Canadian Gil and two (2) free breedings a year to Drum Fire.

Sincerely,

KWIK LOK CORPORATION

Jerre Paxton
President

JP/th

At this time, both stallions were 4 years old. It is important to note no breeding rights were reserved by Mr. Pulse on the bill of sale. The letter granting the breeding rights was drafted and typed by Mr. Paxton and his office staff.

From 1974 until 1979 Canadian Gil and Drum Fire remained in Yakima. Kwik–Lok provided the services of each stallion to Mr. Pulse, who bred mares for each year to Drum Fire and for all but 2 years, to Canadian Gil. Money was never demanded nor offered for the use of the stallions.

On December 14, 1979, Kwik–Lok notified Mr. Pulse by letter it was no longer in a position to provide the breeding rights. Canadian Gil had been sold and moved to Texas; Drum Fire had been sold to a new syndicate. Kwik–Lok's only remaining interest consisted of two free breedings

reserved to Mr. Paxton, as owner of Northwest Farms (formerly Yakima Stallion Station), where Drum Fire was standing at the time of trial.

Kwik–Lok commenced this lawsuit seeking a declaratory judgment regarding the interest of Mr. Pulse in the stallions. Mr. Pulse has admitted in his pleadings he has no present ownership or breeding interest in the thoroughbreds; however, he counterclaimed for damages.

In its initial ruling in favor of Kwik–Lok, the court held the letter was unenforceable based on the following observations concerning the partnership dissolution:

(1) Mr. Pulse executed a bill of sale to Kwik–Lok for Canadian Gil without reserving any breeding rights.

(2) The property owned jointly by the parties was divided in such a manner that both parties were made whole. The value of the breeding rights was not necessary to equalize the distribution of assets.

(3) The letter, which the evidence shows was probably drafted after the conclusion of the partnership dissolution, was not supported by consideration.

(4) The breeding rights were granted as further compensation for Mr. Pulse's labor at the Yakima Stallion Station, but it was compensation that was not legally required.

After Mr. Pulse moved for reconsideration, the court ruled the letter was, in fact, part of the bargained–for exchange in the division of assets. Damages were then awarded to Mr. Pulse.

Kwik–Lok contends the court erred in holding there was good and valuable consideration for the letter. It also argues the document was ambiguous, and parol evidence was admissible to prove a reasonable time was something other than the breeding life of the horse.

Kwik–Lok cites no authority to support its contention that the court erred in holding the letter was given and received for good and valuable consideration; therefore, we will not consider it on appeal. *Chambers–Castanes v. King Cy.*, 100 Wn.2d 275, 290, 669 P.2d 451 (1983).

Kwik–Lok next argues the grant of breeding rights was a

sale of goods subject to Article II of the Uniform Commercial Code. In support of its argument, it cites *Reilly v. King Cy. Cent. Blood Bank, Inc.*, 6 Wn. App. 172, 492 P.2d 246 (1971).

■ RCW 62A.2–105 defines goods as "all things . . . which are movable at the time of identification to the contract for sale . . ." *Reilly* can be distinguished since the blood was readily identifiable and packaged. Sperm inside a stallion, as in this case, is not readily separable, nor able to be packaged.[1]

The dispositive issue raised by Kwik–Lok relates to the fact there is no time limit specified in the contract for the breeding rights to continue. Kwik–Lok argues there is an inconsistency in state law as to the duration of a contract where time limits are not expressed, some cases holding the contract to be terminable at will, *Robbins v. Seattle Peerless Motor Co.*, 148 Wash. 197, 268 P. 594 (1928), others holding the contract to be terminable after a reasonable time. *Smith v. Smith*, 4 Wn. App. 608, 484 P.2d 409 (1971).

■■ The trial court found the instrument to be unambiguous on its face, even though the time of performance was not expressed. The court relied on two assumptions in making its conclusion: (1) the lifetime of the stallions was not an unreasonable duration; (2) Kwik–Lok, which was responsible for drafting the letter, should have expressed a shorter time if that was its intent, relying on the rule of construction that the document must be construed against its drafter. Additionally, in its memorandum opinion the court stated no parol or extrinsic evidence was considered because the seeming ambiguity was resolved by the applicable rule of construction.

Generally, the question of whether a written instrument is ambiguous is a question of law for the court. *Ladum v. Utility Cartage, Inc.*, 68 Wn.2d 109, 411 P.2d 868 (1966). An ambiguity will not be read into a contract where it

---

[1]We note the process of artificial insemination was not used in this instance. Arguably, our conclusion may not apply where sperm is separated from the stallion and shipped to the mare in an appropriate container.

can reasonably be avoided by reading the contract as a whole. *Green River Vly. Found., Inc. v. Foster,* 78 Wn.2d 245, 249, 473 P.2d 844 (1970). The term "ambiguous" has been defined as "'Capable of being understood in either of two or more possible senses". *Ladum,* at 116, quoting *Webster's New International Dictionary* (2d ed.).

. . .

The intent of the parties to the contract is to be gleaned from the document itself, and only if it is ambiguous is parol evidence regarding the parties' actual intent admissible. *Poggi v. Tool Research & Eng'g Corp.,* 75 Wn.2d 356, 451 P.2d 296 (1969).

*McGary v. Westlake Investors,* 99 Wn.2d 280, 285–86, 661 P.2d 971 (1983).

The ambiguity of this letter arises from the parties' failure to specify duration. *See Cromwell v. Gruber,* 7 Wn. App. 363, 366, 499 P.2d 1285 (1972). Thus, the instrument may provide breeding rights for several different time spans:

1. The lifetime of the horse;

2. The breeding life of the horse (either a 15– or 20–year lifespan, depending upon differing expert opinions);

3. The life of Mr. Pulse;

4. Until Kwik–Lok sold the horses;

5. Terminable at will or upon reasonable notice.

Where there is a material omission in a contract, it is the duty of the court to determine the intention of the parties by viewing the contract as a whole and considering all of the circumstances leading up to its execution, including the subject matter and the subsequent acts and conduct of the parties.

*Pacific Title, Inc. v. Pioneer Nat'l Title Ins. Co.,* 33 Wn. App. 874, 878, 658 P.2d 684 (1983). Thus, the trial court erred when it did not consider parol evidence in its attempt to establish the duration of the breeding rights. *Smith v. Smith, supra* at 612; *Pepper & Tanner, Inc. v. KEDO, Inc.,* 13 Wn. App. 433, 435, 535 P.2d 857, 859 (1975); 17 Am. Jur. 2d *Contracts* §§ 329, 330, at 764, 765 (1964); 17A C.J.S. *Contracts* § 503(1) (1963). Whether the contract was for a reasonable time or terminable at will depends upon the

intent of the parties. *Cromwell v. Gruber, supra* at 366.

> If a reasonable period of duration can be implied from the circumstances, the contract is not terminable at will until the lapse of such reasonable time and then only upon reasonable notice. 17A C.J.S. *Contracts* § 398 (1963).

*Cromwell,* at 366–67.

■ Upon reviewing the parol evidence, if the court is unable to make a determination of the parties' intent, it may then apply the rule of construction which construes the document against the drafter. *See Hodgins v. State,* 9 Wn. App. 486, 513 P.2d 304 (1973). The fact this method is one of last resort is recognized in *United States v. Erickson Paving Co.,* 465 F.2d 396, 400 (9th Cir. 1972):

> Yardley also directs our attention to the general rule that the doubt created by an ambiguity will be resolved against the one who prepared the contract. *See* Felton v. Menan Starch Company, 66 Wash.2d 792, 797, 405 P.2d 585, 588 (1965). However, this rule applies only where, after examining the entire contract, the relation of the parties, their intention, and the circumstances under which they executed the contract, the ambiguity remains unresolved. *See* Saturn Oil and Gas Co. v. Northern Natural Gas Co., 359 F.2d 297, 302 (8th Cir. 1966); Boswell v. Chapel, 298 F.2d 502, 506 (10th Cir. 1961) *and cases cited therein.*

*See also Interpetrol Bermuda Ltd. v. Kaiser Aluminum Int'l Corp.,* 719 F.2d 992, 998 (9th Cir. 1983) (amended 1984).

On remand, if the court should determine Kwik–Lok failed to provide breeding services for a reasonable time, Mr. Pulse will be entitled to damages. The rule for assessing those damages in a breach of contract situation is found in *Diedrick v. School Dist. 81,* 87 Wn.2d 598, 609–10, 555 P.2d 825 (1976):

> The general measure of damages for breach of contract is that the injured party is entitled (1) to recovery of all damages that accrue *naturally* from the breach, and (2) to be put into as good a position *pecuniarily* as he would have been had the contract been performed.

(citing *Rathke v. Roberts,* 33 Wn.2d 858, 866, 207 P.2d 716 (1949)). Relating this general rule to the loss of a breeding right, it is necessary to determine the market value of that right at the time the loss occurred and, in the case of Canadian Gil which had been moved to California, decrease the value by the costs involved in transporting and boarding the mare in California for the necessary period of time. (*See Rottinghaus v. Howell,* 35 Wn. App. 99, 109, 666 P.2d 899 (1983) for an analogous situation involving damage to a growing crop.) Market value is defined as "that reasonable sum of money which the property would bring on a fair sale, by a man willing to sell, but not obliged to sell, to a man willing to buy, but not obliged to buy." *McCurdy v. Union Pac. R.R.,* 68 Wn.2d 457, 467, 413 P.2d 617 (1966).

The court awarded damages based upon a 20–year breeding life and the fees charged for the stallions in 1980–82, "live foal guaranteed." Subtracted from that amount was the estimated cost of transporting a mare to California, and, in the case of Drum Fire, a flat $30,000, to reflect the fact lifetime breeding and syndicate shares had not sold when offered for purchase. The future damages were reduced to present value using an 11 percent discount rate.

Kwik–Lok contends the evidence did not support the use of a 20–year breeding life, because their expert testified, based on Internal Revenue Service information, insurance industry mortality tables and studies conducted by the American Horse Council, that the useful breeding life of a stallion is 15 years. It further contends the court's value was inflated because lifetime breeding rights in Drum Fire could be purchased for $20,000 and those of Canadian Gil had no value; or, in the alternative, Mr. Pulse could have purchased syndicate shares for both horses which included lifetime breeding rights, for approximately $43,000.

■ We held in *Barnard v. Compugraphic Corp.,* 35 Wn. App. 414, 417–18, 667 P.2d 117 (1983):

It is well established this court will not disturb trial court findings which are supported by the evidence even if we may have found otherwise. *Thorndike v. Hesperian*

*Orchards, Inc.,* 54 Wn.2d 570, 343 P.2d 183 (1959).

. . .

. . . Evidence of damage is sufficient if it is the best evidence available and affords a reasonable basis for estimating the loss. *Reefer Queen Co. v. Marine Constr. & Design Co.,* 73 Wn.2d 774, 781–82, 440 P.2d 448 (1968). Where damages cannot be ascertained with precision, the trial court must exercise its sound discretion. *V.C. Edwards Contracting Co. v. Port of Tacoma,* [7 Wn. App. 883, 889, 503 P.2d 1133 (1972), *aff'd,* 83 Wn.2d 7, 514 P.2d 1381 (1973)]. The amount of the award will, therefore, not be overturned absent a showing of abuse.

Kwik–Lok's contentions address the weight and credibility to be given the expert witnesses, which is within the province of the trial court. Our review of the record reveals several facts in support of the trial court's conclusions:

1. Mr. Pulse's expert set the service value on Canadian Gil at $55,000 and Drum Fire at $148,700.

2. Other offspring of Northern Dancer, sire of Canadian Gil, had stud fees in excess of $1,250.

3. Insurance underwriters sell policies on stallions who are beyond their 20th year; in addition, there was testimony about stallions which were still breeding well beyond the 20th year.

4. A free lifetime breeding right is preferable to a syndicate share because the syndicate owner is liable for the expenses involved in maintaining the stallion.

5. The inflation rate in the value of stallion stud service has outstripped the general rate of inflation.

6. The annual breeding fee used by the court as the basis for its damage award was conservative in light of the testimony ($2,500 for Canadian Gil; $10,000 for Drum Fire).

We find no error. *Nissen v. Obde,* 55 Wn.2d 527, 529, 348 P.2d 421 (1960); *In re Marriage of Mahalingam,* 21 Wn. App. 228, 231, 584 P.2d 971 (1978).

## CROSS APPEAL

On cross appeal, Mr. Pulse alleges the court made mathematical errors. In its oral opinion the court stated:

They were born in 1969, both of them, foaled in 1969. They could have been bred in '79, so the first year of loss would be 1980. I took as a reasonable breeding lifetime of the stallions 20 years, which left 9 years after the '79 season, or '80 through '89.

Mr. Pulse contends the court should have awarded damages for 10 years rather than 9. He is correct; the number of breeding seasons is 10 (1980 through 1989). Therefore, if damages are awarded on remand, they should be corrected to reflect the additional season. *Baum v. Murray,* 23 Wn.2d 890, 903, 162 P.2d 801 (1945).

Next, Mr. Pulse contends the trial court erred when it reduced the award by $30,000, because that figure was not supported by any credible evidence. In its explanation of that figure, the court stated it was reducing the damages by that amount to reflect the softness in the market regarding the price set for the breedings. The figure represented the highest price asked for a syndicate share of Drum Fire. Again, the test is to rely on the discretion of the court, which determines the damages, based within the range of evidence offered at trial. As stated earlier, we find there was sufficient evidence to support the court's $30,000 reduction.

Mr. Pulse contends the trial court improperly took judicial notice 11 percent was the proper rate to discount the future damages. No evidence related to the discount rate or rate of inflation was presented to the court. In the case of a jury trial, the submission of mathematical tables is discretionary. *Sadler v. Wagner,* 5 Wn. App. 77, 84, 486 P.2d 330 (1971). However, *Mendelsohn v. Anderson,* 26 Wn. App. 933, 940, 614 P.2d 693 (1980) took judicial notice of the fact the difference between inflation and present cash value was de minimis. *See also Hinzman v. Palmanteer,* 81 Wn.2d 327, 336, 501 P.2d 1228 (1972); *Sadler v. Wagner, supra.* Whether or not that is the case at present, if the discount rate is to be a factor in the determination of damages, the parties must have the opportunity to present evidence on that subject. The same would be true for the proper tables to be used.

The judgment of the Superior Court is reversed; the cause is remanded for consideration of parol evidence before determining the reasonable duration of breeding rights, and, in light thereof, damages.

GREEN, C.J., and MUNSON, J., concur.

Reconsideration denied October 7, 1985.