# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| CCT CONSTRUCTION, INC., a Washington corporation, | DIVISION ONE |
| Respondent, | No. 80638-6-I |
| v. | UNPUBLISHED OPINION |
| 4EVER HEALING, LLC, a Washington limited liability company, d/b/a FORBIDDEN CANNABIS CLUB; and SARANJIT BASSI, individually, | |
| Appellants. | |
| SURANJIT BASSI, | |
| Third Party Appellant, | |
| v. | |
| CRAIG SHIPMAN, | |
| Third Party Respondent. | |

DWYER, J. — This is a commercial landlord-tenant dispute. CCT

Construction, Inc. (CCT), the landlord, brought this action for breach of a lease

against 4Ever Healing, LLC (4Ever), the tenant. The trial court ruled in CCT's

favor and awarded damages to CCT. 4Ever appeals from the judgment, arguing

Citations and pin cites are based on the Westlaw online version of the cited material.

that an earlier breach by CCT as well as a constructive eviction excused its performance under the lease, that certain items it installed on the leased premises were not intended to become permanent improvements, that CCT had a duty to mitigate its damages resulting from the breach, and that 4Ever was entitled to an award of attorney fees. We reverse the trial court's decision regarding fixtures but affirm in all other respects.

I

CCT agreed to lease real property and structures in the City of Bonney Lake (the City) to 4Ever for a five-year term commencing June 1, 2016, and continuing to May 31, 2021. The lease provided that the property would be used for a cannabis retail store and that CCT's written consent would be required before any other business or purpose would be allowed.

4Ever, as lessee, agreed to monthly base rental payments of $8,500, due on the first day of each calendar month. CCT and 4Ever orally contracted to defer payment of $2,500 of the rent each month until the store was open for business. Saranjit Bassi, managing member of 4Ever, signed the lease on 4Ever's behalf on June 7, 2016. Craig Shipman, manager of CCT, signed the lease on CCT's behalf. Bassi, acting in his individual capacity, also guaranteed the payment and performance of 4Ever's obligations pursuant to the lease by way of a guaranty signed June 7, 2016.

The property was composed of two parcels, referred to in the lease as "Unit A," containing a residence, and "Unit B," which contained a garage. The lease provided for CCT to continue using Unit A for a 60-day period after the

2

lease's commencement. It also provided that CCT would share on-site parking with 4Ever for the lease's duration. 4Ever agreed to pay CCT an additional $15,000 to cover CCT's expenses incurred in moving out of Unit A within the 60-day period. Although this amount was paid, CCT never vacated Unit A. 4Ever's attempt to rent out Unit A failed when its would-be subtenants arrived on August 1 to find CCT still occupying the unit. At trial, both parties testified to an oral agreement that accounted for CCT's continued presence, although the testimony of the parties varied considerably as to the agreement's substance.

However, 4Ever was unable to obtain approval from the City to open a retail cannabis store. At all times relevant to this litigation, the City maintained a moratorium on such stores within its limits. Although 4Ever and CCT had both been aware of the moratorium at the time of the lease's execution, 4Ever had agreed to pay any fines or penalties incurred in violation thereof. The City did not wait to enforce its ordinance until after the store had opened and, instead, posted a "stop work" order on the site in late August.

4Ever did not pay rent for the month of September, but continued occupying Unit B until September 17, when CCT mailed a 3-day notice to vacate to 4Ever's attorney and posted the 3-day notice on the front door of Unit B. In response, 4Ever immediately began removing items from Unit B, including glass display cabinets that had been bolted down and television monitors that had been affixed to the walls. While CCT did not prevent 4Ever from removing these items, arguments between Shipman and Bassi over whether such items were fixtures that had to remain on the property led to both men telephoning the

3

police, who arrived and informed the parties that removal of personalty was "a civil matter."

By the next day, all of 4Ever's personal property had been removed by Bassi except for a large outdoor air conditioning unit. When Bassi arrived on site with the intent of removing the air conditioning unit, he found that Shipman had parked several vehicles on the property in a manner that obstructed access to the air conditioner. Shipman maintained that the air conditioning unit was a permanent fixture and refused to allow Bassi to remove it. However, Bassi was not otherwise obstructed from entering and exiting the site.

Once he had vacated, Bassi obtained a new lease elsewhere in Bonney Lake and continued his efforts to gain approval for a cannabis retail business. On November 16, 2016, CCT commenced the present action in superior court, alleging that 4Ever breached the parties' contract and that Bassi, as guarantor, was personally liable for the breach. 4Ever then counterclaimed for breach of contract, conversion, forcible entry, and tortious interference with 4Ever's business expectancy, and also asserted claims against Shipman personally.

The parties proceeded to a bench trial that featured often contradictory testimony from Shipman and Bassi. Shipman introduced evidence of the re-rental value of both Units A and B based on his own research. Neither party introduced any evidence as to the costs associated with re-letting the property. The court ultimately found that 4Ever and Bassi were liable for breaching the parties' lease. It computed damages as follows:

> 3. The Lease required that 4Ever Healing pay rent at the rate of $6,000.00 per month until the business opened. The business

4

never opened, therefore, the rent due under the Lease for the Lease term of sixty (60) months is $6,000.00 per month for a total amount of rent due under the Lease of $360,000.00.

4. 4Ever Healing paid rent for three (3) months out of the sixty (60) month term of the Lease. 4Ever Healing paid $15,000.00 to the Plaintiff for a relocation fee. These payments totaling $33,000.00 shall be credited towards the total rent owed by 4Ever Healing under the Lease.

5. The re-rental value of the shop, Unit B, is $2,200.00 per month. The rental value of Unit B during the balance of the Lease term of fifty-six (56) months totals $123,200. This amount shall be credited towards the total rent owed by 4Ever Healing under the Lease.

6. The re-rental value of the residence, Unit A, is $2,700.00 per month, which totals $151,200.00 for the remaining fifty-six (56) months of the Lease term. This amount shall be credited towards the total rent owed by 4Ever Healing under the Lease.

7. 4Ever Healing is entitled to a credit of $6,800.00 against rent due under the lease for lost rent from Unit A due to CCT's failure to vacate Unit A on August 1, 2016.

8. Total damages to CCT from 4Ever Healing's failure to pay rent in breach of the Lease is $45,800.00 based on the following calculation: $360,000.00 total amount due under the Lease - $33,000.00 rent and relocation fee paid by 4Ever Healing - $123,200.00 rental value of Unit B during the balance of the Lease term - $151,200.00 rental value of Unit A during the balance of the Lease term - $6,800.00 lost rent to 4Ever Healing = $45,800.00.

To this number the court added $6,700 for the value of cabinets and television monitors that 4Ever had removed and $8,000 for property taxes for the duration of the lease, but credited to 4Ever the $4,000 balance of a personal loan Bassi had made to Shipman. Thus, the court awarded to CCT damages of $56,500. It also awarded attorney fees to CCT in the amount of $15,325. 4Ever appeals.

II

4Ever's first contention is that its performance on the lease was excused when CCT failed to vacate Unit A within 60 days of June 1, 2016. While the trial

court identified this as a breach of the lease and awarded damages to 4Ever stemming from the breach, it did not hold that 4Ever was excused from performance. This decision was supported by the court's unchallenged findings of fact.

A

When evaluating evidence in a bench trial, our review is limited to determining whether the trial court's factual findings are supported by substantial evidence and whether those findings support the trial court's conclusions of law. Standing Rock Homeowners Ass'n v. Misich, 106 Wn. App. 231, 242-43, 23 P.3d 520 (2001). Substantial evidence is the "quantum of evidence sufficient to persuade a rational fair-minded person the premise is true." Sunnyside Valley Irrig. Dist. v. Dickie, 149 Wn.2d 873, 879, 73 P.3d 369 (2003). On review, the evidence and all reasonable inferences therefrom must be viewed in the light most favorable to the prevailing party. Korst v. McMahon, 136 Wn. App. 202, 206, 148 P.3d 1081 (2006).

Although the trier of fact is free to believe or disbelieve any evidence presented at trial, "[a]ppellate courts do not hear or weigh evidence, find facts, or substitute their opinions for those of the trier-of-fact." Quinn v. Cherry Lane Auto Plaza, Inc., 153 Wn. App. 710, 717, 225 P.3d 266 (2009) (citing Thorndike v. Hesperian Orchards, Inc., 54 Wn.2d 570, 572, 343 P.2d 183 (1959)). We review questions of law de novo. Sunnyside Valley, 149 Wn.2d at 880. When the trial court has mislabeled a conclusion of law as a finding of fact, the conclusion is

also reviewed de novo. Casterline v. Roberts, 168 Wn. App. 376, 381, 284 P.3d 743 (2012).

As to the proper interpretation of the parties' lease agreement, we have stated:

> In construing a lease, the court's function is to ascertain and give effect to the intention of the parties as expressed in their agreement. Murray v. Odman, 1 Wn.2d 481, 96 P.3d 489 (1939); Wilsonian Inv. Co. v. Swope, 180 Wash. 35, 38 P.2d 399 (1934). The agreement must be read and considered as a whole, and if, when so considered, its terms are plain and unambiguous, the intention of the parties will be deduced from the language used. Dennis v. Southworth, 2 Wn. App. 115, 467 P.2d 330 (1970). "Technical terms and words of art are given their technical meaning unless the context or a usage which is applicable indicates a different meaning." RESTATEMENT OF CONTRACTS § 235(b) (1932); see also Amick v. Baugh, 66 Wn.2d 298, 402 P.2d 342 (1965). But if the provisions of a lease are doubtful in that they are reasonably capable of more than one interpretation, the court will adopt that interpretation which is more favorable to the lessee, particularly when, as here, the lease was drafted by the lessor. White v. Coates, 17 Wn.2d 686, 137 P.2d 113 (1943); Murray v. Odman, supra; Gates v. W.B. Hutchinson Inv. Co., 88 Wash. 522, 153 P. 322 (1915).

Allied Stores Corp. v. N. W. Bank, 2 Wn. App. 778, 783-84, 469 P.2d 993 (1970).

B

The parties do not dispute that CCT and 4Ever agreed that Unit A would be vacated within 60 days of June 1, 2016. Nor do they dispute that CCT failed to vacate Unit A by this date. 4Ever Healing did not intend to use Unit A for its cannabis retail business but, rather, sought to rent out Unit A as a residence to defray the costs of setting up a store. It was prevented from doing so when CCT failed to move out.

The trial court did not conclude that CCT's failure to vacate Unit A was a material breach that excused any future performance by 4Ever. In its memorandum decision, the court noted:

> This case is complicated by the fact that both parties breached the lease . . . . The Plaintiff breached the lease when Mr. Shipman did not move out of the house by August 1, 2016. Mr. Bassi never gave notice to the Plaintiff of the breach. 4Ever Healing breached the lease for September, 2016, by failing to pay rent for September.

The parties' contract did not, however, require Bassi or 4Ever to give notice to CCT of the breach. Nor do the trial court's findings of fact and conclusions of law mention any failure to give notice. To the extent that CCT argues that 4Ever was required to give notice of the breach, it is wrong.

The evidence adduced at trial shows that CCT did have actual notice of the breach, as Bassi confronted Shipman about his failure to move out. However, the evidence also shows that 4Ever, rather than ceasing to perform under the parties' contract, sought an arrangement to reduce its rent in return for accommodating Shipman's continued presence, continued occupying and making improvements to Unit B, and continued seeking approval from the City to open a cannabis retail store. These facts all support a finding that Bassi agreed to an oral modification of the parties' written contract, a modification supported by consideration in the form of reduced rent. Furthermore, the trial court ultimately credited to Bassi the rental income that he lost when he was unable to sublet Unit A to other renters, notwithstanding that he had no written agreements with his would-be subtenants.

8

We will not reweigh this evidence. CCT's breach did not excuse 4Ever from performing in accordance with the lease.[1]

III

We now turn to 4Ever's contention that the trial court erred in ruling that glass cabinets, television monitors, and an outdoor air conditioning unit it installed in Unit B were fixtures that became part of the property. Because this is so, 4Ever contends, both the award of damages to CCT for the value of the cabinets and monitors, which 4Ever successfully removed, was erroneous and 4Ever should have received an award of damages for the value of the air conditioner that it was unable to remove. These contentions have merit.

---

[1] 4Ever also claims that the posting of a 3-day notice on the premises, along with CCT's obstructive placement of vehicles on the property the next day, amounted to a constructive eviction. This contention is without merit.

RCW 59.12.040 sets specific requirements for how notice is to be served. There is no dispute that CCT did not comply with the notice requirements of the contract or this statute. There is also nothing in the record supporting 4Ever's bold assertion that posting the notice, in and of itself, constituted a "constructive eviction." Constructive eviction involves an intentional or injurious interference with a leased premises by a landlord or its agents that materially impairs the tenant's power to enjoy the premises. Old City Hall LLC v. Pierce County AIDS Found., 181 Wn. App. 1, 8, 329 P.3d 83 (2014). In the context of a commercial lease, a landlord constructively evicts a tenant by "'seriously interfer[ing] with the tenant's conduct of business on the premises.'" Old City Hall, 181 Wn. App. at 8-9 (quoting 17 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE: REAL ESTATE: PROPERTY LAW § 6.32, at 352 (2d ed. 2004)). Such interference occurs when the landlord commits any wrongful act or omission "whereby the premises are rendered unsafe, unfit, or unsuitable for occupancy for the purpose for which they were leased." Erickson v. Elliott, 177 Wash. 229, 232, 31 P.2d 506 (1934).

The mere posting of a 3-day notice to pay rent or vacate cannot sustain a finding that the premises were rendered unsafe, unfit, or unsuitable for occupancy, particularly when 4Ever did not attempt to remain on the property after the notice was posted. A constructive eviction cannot obtain in such a scenario. See Erickson, 177 Wash. at 233 ("In this case, the premises were vacated without giving the respondents an opportunity to correct the condition. The appellants have not brought themselves within the law justifying the vacation of the premises on the ground of constructive eviction.").

Nor did CCT's placement of vehicles around the premises, for the express purpose of blocking 4Ever's access to an air conditioner, effect a constructive eviction, particularly when 4Ever had already otherwise vacated the property.

"It is well recognized that determining what constitutes a fixture as opposed to personal property is a difficult task, that depends on the particular facts of each case." Union Elevator & Warehouse Co., v. Dep't of Transp., 144 Wn. App. 593, 603, 183 P.3d 1097 (2008). Washington courts apply the common law test of fixtures to determine whether a particular item is personal property or real property. Glen Park Assocs., LLC v. Dep't of Revenue, 119 Wn. App. 481, 486, 82 P.3d 664 (2003). "When, however, a landlord and tenant make a lease agreement in which there are stipulations relative to the ownership of chattels which may be placed upon the leased premises by the tenant, the agreement will be enforced regardless of what might be the rights of the parties at common law." Forman v. Columbia Theater Co., 20 Wn.2d 685, 691, 148 P.2d 951 (1944).

As we have stated:

> Although in a general sense it can be said that all "fixtures" (as distinguished from "trade fixtures") become, at least temporarily, part of the real property and therefore "improvements," the converse is not true. Not all "improvements" are fixtures. Siegloch v. Iroquois Mining Co., 106 Wash. 632, 181 P. 51 (1919); see also Olympia Lodge No. 1, F. & A. M. v. Keller, 142 Wash. 93, 252 P. 121 (1927).
>
> A "fixture" is a chattel which has been annexed to and has become a part of realty but which retains its separate identity and may be removed and become personalty again. See Frost v. Schinkel, 121 Neb. 784, 238 N.W. 659, 77 A.L.R. 1381 (1931); 1 G. Thompson, Real Property § 55 (1964). On the other hand, building materials, although chattels which may be affixed to the land, cannot be removed and regain their prior identity. When combined with labor, building materials become "improvements" to real property, irretrievably losing their separate identity. See Rogers v. Gilinger, 30 Pa. 185, 72 Am. Dec. 694 (1858).

10

Allied Stores Corp., 2 Wn. App. at 782-83. Also relevant to our inquiry is whether the articles annexed to a property are "trade fixtures."

> A tenant may remove things annexed if a court deems them to be so-called "tenant's trade fixtures," a phrase or label that needs to be explained. The word "fixture" usually means something a possessor of land has added that *cannot* be removed, in other words, a thing that has become part of the land by accession. But "tenant's trade fixture" has the opposite meaning; a tenant *may* remove it. . . . Because of the limited duration of his estate, a leasehold tenant, particularly if the term is short, is more likely than an owner to have a presumed intent that things should be removable at the end of his estate. Therefore, Washington has allowed tenants to remove some improvements and additions that are quite firmly annexed to the land if they were installed to aid the tenant in conducting a business.

17 STOEBUCK & WEAVER, SUPRA, § 6.41.

In Forman, tenant Columbia Theater Company leased real property to operate a motion picture theater. The original landlord sold several fixtures in the building to Columbia, including seats, an organ, the screen and projectors, and curtains. Forman, 20 Wn.2d at 688. The parties' lease provided:

> "That on termination of this lease by expiration of the term thereof or otherwise, [Columbia] will immediately without notice quit and surrender said premises to the lessors in as good order and condition and repair as reasonable use and wear of same will permit, and will promptly remove their theater equipment and personal property, *and will leave on said premises all permanent improvements and repairs made during the term*; and that in case they shall hold over after the expiration of the term with the consent of the lessors, express or implied, such holding shall be construed to be a tenancy from month to month at the monthly rent hereinbefore specified."

Forman, 20 Wn.2d at 688-89.

After the original landlord sold the property, Columbia began vacating and removing its fixtures. Forman, 20 Wn.2d at 689. However, it also claimed that

fire doors, automatic fire shutters, wiring, conduits, soundproofing material on the building's walls, the theater's sign and marquee, and illuminated advertising boards that it had installed during its tenancy were not permanent improvements, but were trade fixtures that it was entitled to remove. Forman, 20 Wn.2d at 689-91. The court distinguished these items as "additions and improvements," as opposed to fixtures:

> The theater building owned by respondents was rented for one purpose—the operation of a motion picture theater. The improvements and additions were made for the sole purpose of improving the building for that purpose. The new wiring, the Ozite soundproofing on the walls were merely for the purpose of making the building suitable for the showing of sound pictures. The portion of the wiring which is not imbedded in the walls and floors is attached to the walls by straps which are nailed to the walls. The Ozite is glued to the wall, and the urinal is cemented into the wall and floor. These items definitely "savor of the realty" . . . .
>
> This applies to the electric sign, the false ceiling on the marquee and the reader boards attached thereto. All are physically attached to the building, and the ease or hardship incident to removing them is immaterial.

Forman, 20 Wn.2d at 694. Thus, Columbia contracted away its right to remove improvements, but *not* trade fixtures.

The evidence herein does not support the proposition that 4Ever's glass cabinets, television monitors, and air conditioning unit were improvements that became part of the property upon annexation, as opposed to trade fixtures that 4Ever was entitled to remove. The relevant provision of the parties' lease stated:

> 16. Lessee shall not make any *alterations, additions or improvements* to said Premises without the consent of Lessor in writing first had and obtained, and all alterations, additions and improvements which shall be made at the sole cost and expense of Lessee, and shall become the Premises of the Lessor, and shall remain in and be surrendered with the Premises as a part thereof at

the termination of this Lease, without disturbance, molestation or injury.

(Emphasis added.)  Notably absent from this paragraph is any reference to "fixtures," as opposed to "alterations, additions or improvements" to the premises. Bassi testified that 4Ever did make structural additions to the premises that were left in place, including drywall and ceiling vents, as well as a smaller air conditioning unit.  These items were additions and improvements that could not be removed without causing damage to the premises—thus "irretrievably losing their separate identity" and becoming part of the premises.  Allied Stores Corp., 2 Wn. App. at 783.  In executing the lease herein, 4Ever agreed to leave these items in place.

By contrast, the cabinets, monitors and outdoor air conditioning unit were all removable with a minimum of physical disruption.  All of these items were installed for the purpose of enhancing 4Ever's planned cannabis retail store: glass cabinets would display items available for purchase; the monitors were installed to display a "menu" of available products for customers.  The outdoor air conditioning unit had not yet been fully connected to the building, in contrast with the indoor air conditioning unit that 4Ever had installed and which it left in place. The cabinets, monitors, and outdoor air conditioning unit were trade fixtures, and as such were not within the scope of the applicable lease provision.  4Ever was entitled to remove all of them and is entitled to damages for the value of the outdoor air conditioner that it could not remove.  Likewise, CCT was not entitled to damages for any of these items' removal.  The judgment must be amended accordingly.

IV

Next, we address 4Ever's challenge to the trial court's award of damages based on unaccrued rent. 4Ever asserts that CCT had a duty to mitigate its losses caused by the breach of the parties' lease by reletting the property. Because CCT did not do so, 4Ever avers, CCT was not entitled to damages based on unaccrued rent or on property taxes. Because the trial court, in fact, reduced CCT's award of damages based on the property's re-rental value, this claim is without merit.

"A trier of fact has discretion to award damages which are within the range of relevant evidence." Mason v. Mortg. Am., Inc., 114 Wn.2d 842, 850, 792 P.2d 142 (1990). In considering a fact finder's award of damages, we will only disturb such an award where it is "outside the range of substantial evidence in the record, or shocks the conscience, or appears to have been arrived at as the result of passion or prejudice." Mason, 114 Wn.2d at 850. "'Evidence of damage is sufficient if it is the best evidence available and affords a reasonable basis for estimating the loss.'" Spradlin Rock Prods., Inc. v. Pub. Util. Dist. No. 1 of Grays Harbor County, 164 Wn. App. 641, 663, 266 P.3d 229 (2011) (internal quotation marks omitted) (quoting Kwik-Lok Corp. v. Pulse, 41 Wn. App. 142, 150, 702 P.2d 1226 (1985)). A claimant need not prove damages with mathematical certainty. Harmony at Madrona Park Owners Ass'n v. Madison Harmony Dev., Inc., 160 Wn. App. 728, 737, 253 P.3d 101 (2011).

The requirements for what, if any, action a landlord must take upon a tenant's voluntary abandonment of leased real property differ by jurisdiction.

> The rule that the landlord may recover rent from an abandoning tenant without attempting to relet the premises is the apparent majority rule. The principle of stare decisis has sometimes been called upon to sustain it. However, a substantial number of American jurisdictions have rejected this rule, and the trend is to require a landlord to attempt to relet the premises if the landlord wishes to hold an abandoning tenant liable for rent.

5 THOMPSON ON REAL PROPERTY § 40.11(C)(1) (3d Thomas ed. 2019) (footnotes omitted).

Washington has rejected the majority rule and, instead, generally requires a landlord to mitigate the damages incurred by a tenant's abandonment by reletting the property for the landlord's own account or for the tenant's account. Pague v. Petroleum Prods., Inc., 77 Wn.2d 219, 223, 461 P.2d 317 (1969).

Thus, in Washington, a tenant's liability for unaccrued rent ordinarily ends when a lease is surrendered or terminated. Heuss v. Olson, 43 Wn.2d 901, 905, 264 P.2d 875 (1953). Exceptions to this rule exist. "'[W]hen the forfeiture or surrender is qualified, as in the case of a lease which expressly saves the lessor's right to also recover damages based on unaccrued rent . . . the lessee is not released from liability therefor.'" Hargis v. Mel-Mad Corp., 46 Wn. App. 146, 151, 730 P.2d 76 (1986) (quoting Heuss, 43 Wn.2d at 905).[2]

Here, the trial court did, in fact, reduce CCT's damages by the considerable amount of $274,400 based on an evidentiary estimate of what amount CCT *would* earn from reletting both Unit A and Unit B. This amount was informed in part by Shipman's own testimony:

---

[2] CCT argues that the lease provides it with such a right. We need not decide that question.

15

[COUNSEL]: Have you done any research yourself regarding the value of rentals in Bonney Lake?
[SHIPMAN]: Yes.
[COUNSEL]: What was the source of your research?
[SHIPMAN]: I did Zillow.
[COUNSEL]: That's the online Zillow website?
[SHIPMAN]: That's correct.
[COUNSEL]: How did you use Zillow; how can a person go on Zillow and use it?
[SHIPMAN]: Well, you can type in an address and it will give you . . . . a rental—what they think fair market rental rate is.
[COUNSEL]: Did you do any research regarding the property that's at issue here with the lease?
[SHIPMAN]: Yes, I did.
. . . .
[COUNSEL]: With regard to your most current research, what do you believe is—do you have an opinion about the fair rental value of your property?
[SHIPMAN]: Of the house itself, it would be $1,800 to $2,000.
. . . .
[COUNSEL]: With regard to the garage, is that—would that be a separate value, the shop?
. . . .
[SHIPMAN: Yeah. It would be roughly about $2,000.

The only other evidence in the record of the property's re-rental value was the text of the parties' lease, which provided a monthly base rent of $8,500 for the entire property. The trial court found the re-rental values for the garage and the house to be $2,200 per month and $2,700 per month, respectively—less than the rate set forth in the lease, but greater than the re-rental values to which Shipman attested.

The relief sought by 4Ever was effectively granted by the trial court when it determined the property's re-rental value, applied that to the duration of 4Ever's lease agreement, and credited that amount to 4Ever.[3] A second credit based on

---

[3] Significantly, there was no testimony as to the costs of mitigation. Thus, the trial court adopted the best measure of loss, consistent with the evidence presented.

16

a finding that CCT failed to mitigate its damages would have effected a double recovery for 4Ever. "It is a basic principle of damages, both tort and contract, that there shall be no double recovery for the same injury." Eagle Point Condo. Owners Ass'n v. Coy, 102 Wn. App. 697, 702, 9 P.3d 898 (2000). The amounts credited to 4Ever were well within the range of the evidence. Mason, 114 Wn.2d at 850. The trial court's ruling is affirmed.

V

CCT and 4Ever both seek attorney fees on appeal under RAP 18.1. RAP 18.1(a) permits an award of attorney fees on appeal if authorized by applicable law. When a contract allows for attorney fee awards in the trial court, the prevailing party before this court may seek reasonable attorney fees incurred on appeal. Viking Bank v. Firgrove Commons 3, LLC, 183 Wn. App. 706, 717-18, 334 P.3d 116 (2014). Here, the parties' lease authorized attorney fees for CCT, but not 4Ever. Pursuant to RCW 4.84.330, all unilateral fee provisions are deemed bilateral.

Here, both 4Ever and CCT have prevailed on major issues. Thus, both should bear their own costs and fees. Marassi v. Lau, 71 Wn. App. 912, 916, 859 P.2d 605 (1993), abrogated on other grounds by Wachovia SBA Lending, Inc. v. Kraft, 165 Wn.2d 481, 200 P.3d 683 (2009). We award no fees.[4]

---

[4] 4Ever also challenges the trial court's award of attorney fees. 4Ever was not the prevailing party at trial, and we affirm the trial court in all respects save the fixtures issue. There is no evidence in the record that the attorney fees awarded at trial could be segregated between claims. Thus, we will not disturb the trial court's award of fees.

Affirmed in part, reversed in part, and remanded for further proceedings.

_____

WE CONCUR:

_____    _____